UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| BOSTON TAXI OWNERS ASSOCIATION, INC. RAPHAEL OPHIR AND JOSEPH PIERRE<br>PLAINTIFFS<br><br>v.<br><br>CITY OF BOSTON, MASSACHUSETTS,<br>WILLIAM EVANS, BOSTON POLICE COMMISSIONER,<br>DEPARTMENT OF PUBLIC UTILITIES,<br>DEPARTMENT OF TRANSPORTATION,<br>SECRETARY OF STATE, WILLIAM F. GALVIN<br>COMMONWEALTH OF MASSACHUSETTS<br>DEFENDANTS | Civil Action No.: |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

NOW COME the above captioned Plaintiffs and request that this Court issue a Preliminary Injunction enjoining the Defendants from enacting and/or enforcing the amendments to 540 CMR 2.00 and ordering the Defendants to enforce certain existing regulations against so-called Transportation Network Companies. As the amendments to 540 CMR 2.00 are scheduled to go into effect on Friday, January 16, 2015, Plaintiffs request an expedited, emergency hearing on their Motion.

I.   INTRODUCTION

Plaintiffs, who are taxicab owners and operators, have brought the instant claim to prevent the amendment to certain regulations that arbitrarily violate the Plaintiffs' and other taxi companies' constitutional rights accorded to them under the Fourteenth Amendment to the U.S. Constitution. The proposed changes to the regulations, 540

CMR 2.00, define companies such as Uber Technologies, Inc. ("Uber"), Lyft, Inc. ("Lfyt"), and Side.Cr, LLC ("Sidecar") as so-called Transportation Network Companies ("TNCs"), and permit them to compete with the Plaintiffs without adhering to the requirements of taxi regulations (Exhibit A, 540 CMR 2.00).  In particular, the regulations promulgated by Defendants allows TNCs to use practically any vehicle and charge any fare, while requiring taxicab drivers to incur substantial cost to operate their vehicles and to charge set-rates.  The distinction between TNCs and taxicabs has created a two-tiered system that violates Plaintiffs' rights to equal protection and due process without a rational basis for such distinction.

II.    <u>FACTS</u>

The facts are drawn from the allegations in the Verified Complaint and, to the extent not set forth below, are incorporated herein.

The Boston taxi industry is highly regulated by state statutes, city rules and ordinances and multiple agreements that specify how medallion owners, radio associations, drivers and credit card processors must operate together.  These legal controls are designed to ensure that taxi services in Boston will operate safely, reliably and without discrimination.

The Massachusetts legislature has given the City of Boston (the "City") authority to regulate all vehicles "used or designed to be used for the conveyance of persons for hire from place to place within the City of Boston."  <u>See</u> M.G.L. c. 40, § 22 and M.G.L. c. 159, Massachusetts Session Laws of 1930, Chapter 392 of the Session Laws of 1963, Chapter 386).  The City, pursuant to the powers vested in it by the Massachusetts legislature, granted authority to the Police Commissioner ("Commissioner") of the

Boston Police Department ("BPD") to enact Rule 403, the Hackney Carriage Rules and Flat Rate Handbook, which applies to all vehicles "*used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston*." (Exhibit B, Hackney Carriage Rules and Flat Rate Handbook, Boston Police Department, Rule 403.1.I.a.). The Taxi Rules explicitly state that they are intended to be a "comprehensive and definitive listing of all regulations affecting the Hackney Carriage industry in the City of Boston…" (Taxi Rules Section 1(II)(c))[Emphasis Added]. The way the existing Rules are written, they apply to TNCs, however, the City has failed to enforce the Rules against the TNCs.

The current version of Rule 403 is the product of decades of revisions, designed to protect consumers, ensure public safety, safeguard competition, and provide non-discriminatory taxi services to all areas of the city and to the elderly and disabled. The plaintiffs and all medallion owners operating in Boston have invested significant capital and resources to develop systems of infrastructure that meet Rule 403's broad ranging requirements. The rules are elaborate, highly detailed and very restrictive controlling virtually every aspect of the taxi businesses. Boston's taxi regulations are designed to ensure that Boston's taxi services are safe, reliable and non-discriminatory. The City issues a limited number of taxi licenses, called taxi medallions. A taxicab cannot operate in Boston without one of the 1825 city-issued taxi medallions. The City has enacted numerous regulations with which that taxi operators must comply. TNCs are not required to comply with the majority, if any, of these regulations.

The hallmark of the marketplace in transportation services created by the heavily regulated industry had been competition on a level playing field. Taxi owners and

drivers worked in a competitive environment, all subject to the same regulations – until the insurgence of unregulated providers.

The For-Hire Transportation business consists of four simple elements, whether the service is provided by a taxi or a TNC: a driver, a vehicle, a passenger and payment. These elements do not depend on how the connection between driver and passenger is made, whether visual (by street hail or taxi queue), or electronic (by telephone, smartphone or web site).  For decades the City heavily regulated all For-Hire Transportation providers under uniform rules. The rules were designed to protect the public, regulate traffic, address congestion and provide public service.

The de facto taxi companies (such as UberX, Lyft and Sidecar) do exactly the same thing that traditional taxi companies do. They dispatch drivers to passengers who pay fares based on the time and distance traveled. That the de facto taxi companies dispatch the car and driver via smartphone does not distinguish their business activity from that of traditional taxis, which also now use smartphones as one means of connecting driver and passenger.  TNCs are an unlicensed taxi service.

All TNC vehicles must, therefore, be considered "hackney carriages" under Boston's regulations, and cannot operate legally without medallion and hackney-licensed driver. The Taxi Rules are clear:

> *In the City of Boston, <u>no person, firm, or corporation</u> driving or having charge of a taxicab or other private vehicle <u>shall offer the vehicle for hire for the purpose of  transporting, soliciting and/or picking up a passenger</u> or passengers unless said person is licensed as  a hackney driver and said vehicle is licensed as a hackney carriage by the Police Commissioner.*

>(City of Boston Code 16-15.05: Vehicle for Hire Ordinance) (Appendix I to Taxi Rules) [Emphasis Added].

Every TNC driver operating in the City of Boston must, under the provisions of the Vehicle for Hire ordinance quoted above have a medallion. None of them do, and all TNC drivers in Boston are, therefore, operating illegally. This massive illegal operation puts the public and consumers at risk in many ways.

Use of a smartphone app does not change the nature of the business. It does not alter the need for uniform rules for all who engage in it. Use of an app merely provides an alternative means of dispatch and payment. The service provided remains For-Hire Transportation. An app does not make a car safer, qualify or train a driver, protect the passenger, or insure the public when accidents occur. Because cars, drivers and passengers exist and travel in the real world, not the virtual world, the same public safety concerns exist regardless of how passenger and driver connect. Therefore, the rules governing the activity should be substantially the same for all.

Plaintiffs seek a preliminary injunction to restrain and enjoin Defendants from enforcing the proposed regulation that creates an irrational, two-tiered regulatory system that unconstitutionally harms the economic and property rights of the Plaintiffs. Plaintiffs also seek to force the Defendants to apply the existing Rules to the TNCs.

III.    ARGUMENT

A.    **Standard for Relief**

A preliminary injunction seeks to preserve the status quo, pending a determination on the merits. *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995).

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, the Court may issue a preliminary injunction if the Plaintiffs can demonstrate: 1) a substantial likelihood that Plaintiffs will succeed on the merits; 2) a potential for irreparable harm to the Plaintiffs if the injunction is not granted; 3) the balance of the hardship to the Defendants if enjoined and the hardship to Plaintiffs if the injunction is not granted, and; 4) the effect of the injunction on the public interest. *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 443 F.3d 13, 18 (2006). A preliminary injunction is particularly appropriate where, as here, there is a deprivation of constitutional rights. See *McLaughlin by McLaughlin b. Boston School Committee*, 938 F. Supp. 1001 (D. Mass. 1996). In this case, the Plaintiffs have more than adequately satisfied the requirements for the issuance of a preliminary injunction.

**B.     Plaintiffs have a substantial likelihood of success on the merits.**

    1.     *Defendants have violated the Takings Clause by authorizing TNCs to provide "de facto" taxi services without buying or leasing medallions.*

The Fifth Amendment to the U.S. Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." This protection is designed to prevent the state and local government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

In Massachusetts, taxicab owners have a property interest in medallions. See *Town Taxi Incorporated v. Police Comm'r of Boston*, 377 Mass. 576, 387 N.E.2d 129 (1978), *Sebago v. Tutunjian*, 85 Mass.App.Ct. 1119 (2014) (unpublished disposition); *Ilacqua v. Ilacqua*, 75 Mass.App.Ct. 1102 (2009) (unpublished disposition). As a result,

similar to due process disputes over taxicab licenses or permits, courts look to the local legislation to determine the existence and extent of a property interest. *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 265-66 (5th Cir.2012) (addressing New Orleans taxicab ordinance); *Minneapolis Taxi Owners Coalition, Inc. v. City of Minneapolis*, 572 F.3d 502 (8th Cir. 2009) (examining Minneapolis ordinance uncapping number of transferable taxi licenses); *Witharana v. NYC Taxi Limousine Comm'n*, 2013 WL5241987 (E.D.N.Y. Sept. 17, 2013) (addressing New York City taxi licensing system); *Speed's Auto Services Group, Inc. v. City of Portland, Or.*, Case No. 3:12-CV-738-AC, 2013 WL1826141 (D. Or. Apr. 30, 2013) (addressing constitutional challenges to Portland cab ordinance); *Boonstra v. City of Chicago*, 214 Ill. App. 3d 379, 381, 574 N.E.2d 689, 691 (Ill. App. Ct. 1991).

The City of Boston, pursuant to the powers vested in it by the Massachusetts legislature, granted authority to the Police Commissioner ("Commissioner") of the Boston Police Department ("BPD") to enact Rule 403, the Hackney Carriage Rules and Flat Rate Handbook, which applies to all vehicles "<u>used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston</u>." (Exhibit B, Hackney Carriage Rules and Flat Rate Handbook, Boston Police Department, Rule 403.1.I.a.). The Taxi Rules explicitly state that they are intended to be a "comprehensive and definitive listing of all regulations affecting the Hackney Carriage industry in the City of Boston…" (Taxi Rules Section 1(II)(c)) [Emphasis Added]. Pursuant to Rule 403, the City of Boston has issued a limited number of medallions, currently capped at 1825. (Exhibit C, Taxi Consultant Report, October 11, 2013, Nelson Nygaard in Association with Taxi Research Partners, p. 3-5). The City recently conducted a study

7

using Nelson Nygaard, an independent firm, in which it was determined that there is no need to issue additional medallions.

Historically, individual medallions in the City of Boston have cost over One Hundred Thousand ($100,000.00) Dollars.  (Exhibit D, Affidavit of Raphael Ophir) (Exhibit E, Affidavit of Joseph Pierre).  Without compensation to the medallion owners and lenders holding security interests in the medallions, the City of Boston has permitted, and via the scheduled enactment of the amendments to 540 CMR 2.00 has expressly authorized, the TNCs to usurp and trespass upon the exclusive property rights of the Plaintiffs and other medallion owners, as the regulations do not require TNCs to own or lease a medallion in order to operate their vehicles.  The TNCs have been and continue to provide For-Hire Transportation services without buying or leasing medallions or otherwise complying with the City Taxi Regulations, thereby taking exclusive rights from medallion owners and transferring them to TNCs without any compensation, let alone the just compensation that the Takings Clause requires.  The Defendants' actions also deprive Plaintiffs of the fundamental property right that the City expressly granted with the sale of the medallion: the exclusive right of medallion owners to provide For-Hire Transportation in the City.  This deprivation has and will continue to seriously devalued the Plaintiffs' medallions.  Therefore, there is a substantial likelihood that Plaintiffs will prevail on their violation of Takings Clause claim.

> 2. *Defendants' actions in continuing to enforce taxi regulations on Plaintiffs but not against TNCs and the disparate treatment accorded to TNCs under the proposed amendments to 540 CMR 2.00 deprives Plaintiffs of their rights under the Fourteenth Amendment of the U.S. Constitution.*

Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, a statute will be upheld if it is rationally related to the furtherance of a

legitimate state interest. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993); *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 1st Cir. (2003). While the rational basis inquiry may be deferential, it is not "toothless". *Mathews v. Lucas*, 427 U.S. 495, 510 (1976).

In the instant case, Defendants have turned a blind eye to TNCs' failure to adhere to regulations imposed on taxi operators, and in fact will permit TNCs to operate without compliance with the passing of the amendments to 540 CMR 2.00, including the requirements to: purchase a medallion; pay annual license fees; maintain commercial liability and worker's compensation insurance; operate only newer, regularly inspected vehicles; satisfy driver-licensing requirements, and pay thousands of dollars annually per medallion in City and State fees and taxes. (Exhibit D, Ophir Aff.) (Exhibit E, Pierre Aff.).

The City has promulgated rules to protect the public from dangerous cab drivers by requiring hackney license applicant's to meet seventeen criteria before they can even apply for a license, which TNCs do not need to meet, including:

    a)    be twenty-one (21) years of age or older;
    b)    pass a standard examination demonstrating the ability to speak, read, write and understand the English Language;
    c)    participate in Hackney Carriage testing and training as determined by the Inspector of Carriages;
    d)    have an original Birth Certificate, Alien Card, Asylum Document, US Passport or Naturalization Papers;
    e)    not have a Hackney Carriage Driver's License that is revoked or suspended in any jurisdiction;
    f)    have a valid Massachusetts Driver's License;

g)  have had a Driver's license in the United States for at least two (2) years;

h)  not have been adjudged a Habitual Traffic Offender, as defined by Massachusetts General Law Chapter 90 section 22F, or the equivalent in any jurisdiction, within the past five (5) years;

i)  not have any outstanding or unresolved driving infractions which could result/in the applicants Driver's license being suspended or revoked in any jurisdiction;

j)  not have had his or her Driver's License suspended for five (5) or more Surchargeable Incidents, as defined by Chapter 211 of the Code of Massachusetts Regulations section 134, or the equivalent in any jurisdiction, within past five (5) years;

k)  not have more than four violations of the Traffic Laws and/or At-Fault Accidents as, defined by Chapter 211 of the Code of Massachusetts Regulations Section 134 or an equivalent department in the last three (3) years (violations and accidents occurring on the same date will count as only one) in any jurisdiction;

l)  not have any Operating Under the Influence of drugs or alcohol convictions or dispositions under Massachusetts General Law Chapter 90 section 24D within the past five (5) years or the equivalent in any jurisdiction;

m)  not have any felony convictions within the last five (5) years in any jurisdiction;

n)  not have any drug convictions in the last five (5) years in any jurisdiction;

o)  not have any dispositions for a criminal offense, in any jurisdiction, that would result in the, denial of a license, including admissions to sufficient facts or continuance of an offense without resolution, unless the circumstances of such incident are, reviewed by the Inspector of Carriages as to the specific facts and

circumstances and the applicant is thus approved by the Inspector of Carriages;

p)   not be required to register as a sex offender in any jurisdiction; and

q)   not have any outstanding or unresolved criminal court cases in any jurisdiction which could result in the license being denied if the Applicant was convicted of the alleged offense.

(Exhibit B, Hackney Carriage Driver Standards, Taxi Rules Appendix I).

There are numerous disparities in treatment of taxi companies and TNCs. For example, once taxi operators have a license, they must abide by a strict standard of rules, requiring them not to possess alcohol in their vehicle, not to talk on a cell phone, not to smoke or permit smoking. These rules are enforced by the Inspector of Carriages, who can conduct hearings on complaint and suspend or revoke a license. Again, TNCs do not have to meet any such requirements.

The City requires taxi operators to invest in and operate only cars that are of a certain age and body style, and are subject to regular City inspections, but the City allows de facto taxi companies to deploy private drivers in their own personal cars of any age or condition with no inspection requirement. The City requires that all taxis have a protective barrier of metal and lexan between the front and back seats. These barriers not only protect drivers from assault and theft but also protect the driver from impaired passengers that may interfere with the driver's ability to operate the taxi thereby causing an accident. TNCs have no such requirement.

Every Boston taxi must be equipped with an Inspector approved GPS system that gives the Boston Police Department internet access, both in real time and for a year after any trip, to the location of every taxi, the pick-up and drop off points and how the

passenger paid and the exact route followed. Every taxi must also have a panic button. TNCs do not have to adhere to such requirements.

The City requires taxi operators to maintain expensive primary commercial liability insurance that applies at all times to the taxis, but TNCs are not required to carry such commercial insurance and are knowingly permitted to give uninsured rides to unwary Bostonians and visitors without insurance. Moreover, there is currently no available insurance specifically for TNCs. (Exhibit C, Affidavit of Raphael Ophir).

The City sets meter rates for traditional taxis that apply to all taxi rides, even when taxis accept passengers via a smartphone dispatch in an identical fashion as the de facto taxis, yet the City permits TNCs to charge any rate, and to impose large surcharges during times of high demand.

The City requires many owners of taxis to buy and operate very expensive wheelchair accessible vehicles, but it imposes no such obligation on the de facto taxi companies. Such arbitrary favoritism damages the Plaintiffs by reducing their revenues. It also seriously handicaps their ability to compete fairly against the de facto taxi companies to recruit drivers, which threatens to destroy their businesses entirely. (Exhibit D, Affidavit of Raphael Ophir).

The Taxi Rules Anti-Discrimination Clause states that:

> A Hackney Carriage Driver may not refuse any passenger on the basis of race, sex, religion, disability, sexual orientation, national origin, or location of the passenger's pick-up or destination in any circumstance.

The de facto taxi drivers working for a TNC can ignore this requirement without any adverse consequence.

Boston taxi drivers are required to accept multiple forms of payment, including cash, credit cards, vouchers, and Boston Taxi Industry Elderly Program (BTIEP) coupons, which allow customers, who are elderly, handicapped, disabled or suffer from cancer to pay discounted rates. (Taxi Rules, Section 9.II.b; Taxi Rules, Section 7.1.). The de facto taxi drivers working for a TNC can ignore this requirement without any adverse consequence, and in fact, most are forced through the TNC to accept only credit card payments.

Defendants cannot point to <u>any</u> rational basis or legitimate state purpose for enforcing the City's regulations against Plaintiffs and taxicab companies but not against the de facto taxi companies. Moreover, the amendments to 540 CMR 2.00 permit de facto taxi companies to operate without adhering to the majority of the City's taxi regulations.

As previously stated, the cost of purchasing or leasing a medallion can be in excess of One Hundred Thousand ($100,000.00) Dollars, and compliance with the City's taxi regulations costs over Twenty Thousand ($20,000) Dollars per month. (Exhibit D, Ophir Affidavit) (Exhibit E, Pierre Affidavit). As a result of the amendments to 540 CMR 2.00, Plaintiffs are put at a substantial economic disadvantage to TNCs. Moreover, Defendants have continued to allow TNCs to charge any fare the driver chooses. Taxi operators, however, do not have the same opportunity to financially prosper, as they may charge only the rates permitted by the City. No explanation can or has been presented by the Defendants for the disparate treatment of taxi operators and TNCs. While the Equal Protection Clause often permits government to draw distinctions that are rationally related to legitimate governmental interests, the distinctions summarized above and

detailed below do not pass constitutional muster. They are arbitrary, fundamentally unfair and unconstitutional. The City has arbitrarily forced participants in the same business to operate by very different rules.

The constitutional protections of equal protection and due process rest on bedrock principles of fundamental fairness. Under our constitutional system, government must apply reasonable rules fairly to similarly situated persons. People engaging in the same business activity must be held to the same rules. The rules must rationally relate to a legitimate governmental objective. The City's disparate treatment of Plaintiffs and TNCs violates all of these principles.

Requiring the TNCs to comply with the taxicab regulations is not only necessary to protect the health, safety and welfare of the public, but ensures the "same level playing field" for all taxicab operators, regardless of whether the rides are being generated by telephone, hailing a taxicab on the street or use of an internet app-based system. This irrational economic disparity between similarly situated operators for hire violates the Due Process and Equal Protection clauses of the 14th Amendment of the Massachusetts Constitution.

Principles of fundamental fairness also animate the constitutional right to just compensation when the government takes private property. That right is particularly important where, as here, the government itself created the property right, sold it to private parties and developed a system under which hundreds of private parties were induced and required by government to invest and risk hundreds of millions of dollars as a precondition to engaging lawfully in business. These constitutional protections – equal

protection, due process and just compensation – allow people to take investment risks and allow businesses to compete fairly.

Therefore, Plaintiffs have a substantial likelihood of demonstrating that Defendants have violated the Equal Protection Clause of the U.S. Constitution.

### C.   Irreparable Harm to the Plaintiff

Violations of fundamental constitutional rights always constitute irreparable harm. *Dunn v. Blumstein*, 405 U.S. 330, 351 (1972).  In this case, there are violations of Plaintiffs' constitutional rights, as the Plaintiffs' property rights in their medallions are being taken without just compensation in violation of the Takings Clause and Defendants have arbitrarily set different requirements for TNCs and taxi owners and drivers with the impending promulgation of the amendments to 540 CMR 2.00 and failure to enforce the City's taxi regulations against TNCs.

Defendants' disparate treatment of TNCs also irreparably harms the Plaintiffs and other taxi owners and drivers by diverting the ridership base of licensed taxis to the unlicensed TNCs, thereby causing substantial economic harm to Plaintiffs.  By declining to extend the requirement to TNCs to purchase or lease medallions, Defendants are irreparably harming Plaintiff's ownership interest in their medallions.

### D.   Lack of Harm to the Defendants

There will be no harm suffered by the Defendants, as the temporary delay to the promulgation of amendments to the regulations is necessary to correct the violation of Plaintiffs' and other taxi operators' constitutional rights and drafting legislation that does not violate the U.S. Constitution.  The balance of harms weighs heavily in favor of the status quo.

### E. Public Interest

The public interest will be served by the issuance of the injunction, as the amendments to 540 CMR 2.00 explicitly permit TNCs to operate without complying with the majority of the City's taxi regulations that are in place to protect the public welfare. The current version of Rule 403 is the product of decades of revisions, designed to protect consumers, ensure public safety, safeguard competition, and provide non-discriminatory taxi services to all areas of the city and to the elderly and disabled. Allowing the TNCs to operate without compliance with the City's taxi regulations poses a serious risk of harm to the public.

Requiring the TNCs to comply with the taxicab regulations is not only necessary to protect the health, safety and welfare of the public, but ensures the "same level playing field" for all taxicab operators, regardless of whether the rides are being generated by telephone, hailing a taxicab on the street or use of an internet app-based system.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court issue a preliminary injunction, enjoining Defendants from enacting and/or enforcing the amendments to 540 CMR 2.00 and requiring the City to enforce the existing taxi regulations against TNCs.

                                      Respectfully Submitted,
                                      Plaintiffs,
                                      By their Attorneys,

                                      __/s/ Jenifer M. Pinkham_____
                                      Jenifer M. Pinkham
                                      BBO #658031
                                      Tiffany L. Stichel
                                      BBO #672713
                                      Schlossberg, LLC
                                      35 Braintree Hill Office Park
                                      Suite 204
                                      Braintree, MA 02184
                                      781.848.5028
                                      jpinkham@sabusinesslaw.com

Dated: January 16, 2015

G:\Boston Taxi Owners Association, Inc.-BY007\BTOA v. City of Boston-Comm of Mass-004\Docs\Memo PI 011515.docx