```
                    United States District Court
                       District of Massachusetts
 _____
                               )
BOSTON TAXI OWNERS ASSOCIATION,)
INC., RAPHAEL OPHIR and JOSEPH )
PIERRE                         )
                               )
           Plaintiffs,         )
                               )
      v.                       )
                               )
CITY OF BOSTON, BOSTON POLICE  )    Civil Action No.
COMMISSIONER WILLIAM EVANS,    )    15-10100-NMG
COMMONWEALTH OF MASSACHUSETTS, )
MASSACHUSETTS DEPARTMENT OF    )
TRANSPORTATION, MASSACHUSETTS  )
DEPARTMENT OF PUBLIC UTILITIES )
and SECRETARY OF STATE WILLIAM )
F. GALVIN,                     )
                               )
           Defendants.         )
 _____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

In this action, the Boston Taxi Owners Association, Inc., along with two individual Boston taxicab license owners, Raphael Ophir and Joseph Pierre, (collectively, "plaintiffs"), have raised a federal constitutional challenge to recent amendments to regulations relating to the registration of motor vehicles. The suit is brought against the Commonwealth of Massachusetts, the Massachusetts Department of Public Utilities ("DPU"), the Massachusetts Department of Transportation ("MassDOT") and Secretary of State William F. Galvin (collectively, "the state defendants"), and also against the City of Boston and Boston

-1-

Police Commissioner William Evans (collectively, "the city defendants").

The recent amendments to the subject regulations establish standards for the registration of motor vehicles providing services for so-called Transportation Network Companies ("TNCs"), such as Uber, Lyft and Sidecar. See 540 CMR 2.05. Plaintiffs contend that those amendments create an arbitrary, two-tiered system between TNCs and taxicabs that violate plaintiffs' constitutional rights.  Moreover, they argue that the continuing failure of the City of Boston to enforce its own local regulations governing the Hackney Carriage industry against TNCs also violates plaintiffs' constitutional rights.

Pending before the Court is plaintiffs' emergency motion for a preliminary injunction (1) to enjoin defendants from enforcing the amendments to 540 CMR 2.05, which became effective on January 16, 2015, and (2) to order the city defendants to enforce certain regulations governing the Hackney Carriage industry against TNCs.  For the reasons that follow, the motion will be denied.

## I. Background

### A. Regulation of the Boston Taxi Industry

The main source of regulation for the City of Boston ("the City" or "Boston") taxicab industry is its Police Commissioner ("the Commissioner"), who is authorized by state statute to

regulate the taxi business in Boston.  In exercising that authority, the Commissioner requires anyone who drives or is "in charge of" a "hackney carriage" (i.e. taxicab) to possess a license known as a "taxicab medallion."  There are currently 1,825 city-issued medallions.

In 2008, the Commissioner issued a comprehensive set of taxicab regulations under Boston Police Department Rule 403 ("Rule 403").  Rule 403 defines a taxicab as "[a] vehicle used or designed to be used for the conveyance of persons for hire from place to place within the City of Boston."  Since its inception, Rule 403 has not been applied to livery vehicles, despite the fact that the broad definition of a taxicab would seem to encompass them.

The rule requires all taxicab operators, <u>inter alia</u>, to possess a medallion, maintain a properly equipped and functioning taxicab, display a hackney carriage license at all times, refrain from cell phone use while operating a taxicab and belong to an approved dispatch service or "radio association."  Rule 403 also sets out the approved manner in which a taxicab in the City can engage customers.

Beginning in around 2012, companies such as Uber, Lyft and Sidecar began operations in Boston and surrounding communities.  The cellular phone app-based, for-hire transportation services have quickly gained in popularity and serve as an alternative to

traditional taxicab or livery services.  The new companies rely, to varying degrees, on drivers who provide pre-arranged transportation services in their own private vehicles.  The City of Boston has yet to issue regulations applicable to such companies, nor does it enforce Rule 403 against them.  In October, 2014, however, the City convened a "Taxi Advisory Committee" which is authorized to examine the City's regulatory framework of for-hire transportation services and perhaps to develop new policies to account for these relatively new entrants into the market.

### B.   State Regulation of Motor Vehicle Registration

Overlaying the specific city regulations for taxicabs, MassDOT has enacted statewide requirements for the registration of all motor vehicles. 540 CMR 2.05.  Prior to the recent amendments, 540 CMR 2.05 outlined two ways in which small-scale vehicles (designed to carry 15 or fewer passengers) need be registered in order to carry passengers for hire.  The first kind of registration pertained to "taxicabs", defined as

> any vehicle which carries passengers for hire, and which is licensed by a municipality pursuant to M.G.L. c. 40, § 22 as a taxicab.

The second kind of registration was for a "livery vehicle", defined as

> any limousine or other vehicle which ... carries passengers for hire ... [but] is not required to

>   obtain a taxicab license pursuant to M.G.L. c. 40, § 22.

As of January 16, 2015, MassDOT revised 540 CMR 2.05 to include a third alternative for the registration of small-scale vehicles used to carry passengers for hired transportation. Under this third option, private passenger vehicles can be registered and used as "personal transportation network vehicles" on behalf of Transportation Network Companies, or TNCs.  TNCs are defined as

>   entit[ies] operating in Massachusetts that, for consideration, will arrange for a passenger to be transported by a driver between points chosen by the passenger.

The amended regulations also restrict the way in which drivers using their own private vehicles on behalf of a TNC can solicit customers.  Specifically, the TNC must have <u>pre-arranged</u> for the driver to provide transportation services and the driver is not permitted to solicit or accept an on-demand ride, otherwise known as a "street hail" or "hail pick-up."  Thus, the amended regulations broadly define TNCs and permit TNC drivers to use their own private vehicles so long as they register the vehicle as a "personal transportation network vehicle" and provide transportation services only to passengers that the TNC pre-arranged.  Accordingly, the new regulations provide some restrictions on the way in which companies such as Uber, Lyft and Sidecar operate within the Commonwealth.

The amendments to 540 CMR 2.05 also (1) require TNCs to obtain a certificate from the DPU in order to do business in Massachusetts, (2) require TNCs and their drivers to carry appropriate liability insurance, (3) require TNCs to perform background checks on their drivers and (4) set standards for TNC drivers.

The new state regulations do <u>not</u> address whether TNC drivers must obtain taxi medallions which is a matter of local regulation.

### C. Procedural History

Plaintiffs filed their lawsuit and emergency motion for preliminary injunction on January 16, 2015, the same day that MassDOT's amendments to 540 CMR 2.05 went into effect. After another United States District Judge entered an Order of Recusal, the case was assigned to this Session on January 20, 2015. The Court held a hearing on the pending motion shortly thereafter.

### II. <u>Plaintiffs' Motion for a Preliminary Injunction</u>

Plaintiffs' motion for a preliminary injunction seeks two separate kinds of injunctive relief. First, plaintiffs seek a negative injunction to prevent the enforcement of MassDOT's amendments to 540 CMR 2.05. They assert that the amendments permit TNCs to operate as "de facto taxis" and "create an irrational, two-tiered regulatory system" that

unconstitutionally violate the due process and equal protection clauses. Second, plaintiffs seek an affirmative injunction that would mandate that the City of Boston enforce its existing taxicab regulations, encompassed in Rule 403, against TNCs operating within city limits. They contend that the City's failure to do so violates their equal protection rights and constitutes an unconstitutional taking of their property.

### A.   Legal Standard

In order to obtain a preliminary injunction, the moving party must establish

> (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships and (4) a fit (or lack of friction) between the injunction and the public interest.

Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003) (citation omitted). Out of these factors, the likelihood of success on the merits "normally weighs heaviest on the decisional scales." Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009).

Importantly, "[a] preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right." Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc., 645 F.3d at 32 (quoting Munaf v. Green, 553 U.S. 674, 689-90 (2008)). An "injunction should issue only where the intervention of a court of equity is essential in order

effectually to protect property rights against injuries otherwise irremediable." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (citation and internal quotations omitted).

The Court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114, n.2 (D. Mass. 2010) (quoting Elrod v. Burns, 427 U.S. 347, 350, n.1 (1976)). The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction. See Asseo v. Pan American Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986).

**B. Application**

**1. Likelihood of Success**

**i. Takings Clause**

Plaintiffs initially contend that Boston taxicab owners have a property interest in city-issued medallions. Plaintiffs assert that the City has effectively taken the exclusive rights to operate taxicabs within Boston from medallion owners without just compensation by its continuing decision not to enforce Rule 403 against TNCs. Moreover, plaintiffs argue that the enactment of the amendments to 540 CMR 2.05 expressly authorizes TNCs to operate in the City without buying or leasing medallions. They contend that this unconstitutional taking adversely affects the

market value of their medallions and is therefore unconstitutional.

In opposition, the city defendants proffer three reasons why plaintiffs' takings clause claim should fail: (1) plaintiffs do not have a constitutionally protected property interest in the market value of taxi medallions, (2) the City's non-enforcement of Rule 403 against TNCs is not an affirmative governmental act giving rise to a takings claim and (3) non-enforcement of Rule 403 as to TNCs is not a regulatory taking against medallion owners.

Also in opposition, the state defendants contend that plaintiffs' takings claim fails to account for the fact that amended 540 CMR 2.05 does not in any way regulate plaintiffs' property interest, if one in fact exists, in taxi medallions. Instead, the state defendants assert that the amended regulations merely create a new registration option for vehicles legally to provide pre-arranged transportation services. That is, whether TNCs and their drivers need to comply with Rule 403 and its accompanying medallion rules is up to local authorities and is not affected by the amendments to 540 CMR 2.05. Thus, they conclude that the takings claim is viable only against the City.

### a.  Legal Standard

The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without just compensation. Maine Educ. Ass'n Benefits Trust v. Cioppa, 695 F.3d 145, 152 (1st Cir. 2012). The clause applies to

> not only the paradigmatic physical taking ... but also to regulatory interferences, which transpire when some significant restriction is placed upon an owner's ... property [use] for which fairness and justice require that compensation be given.

Id. (citation and internal quotations omitted).

When assessing whether a regulatory taking occurred, courts utilize a three-pronged analysis which considers (1) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations, (2) the regulation's economic impact on the property owner and (3) the character of the government action. Id. at 153 (citing Penn Cent. Transp. Co v. City of New York, 438 U.S. 104, 124 (1978)). Rather than operating as a set formula or checklist, these factors serve as "a lens through which a court can view and process the facts of a given case." Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998).

### b.  Application

For a variety of reasons, plaintiffs have failed to show a likelihood of success on the merits of their Takings Clause claim.

First, the Court agrees with the state defendants that the takings claim is appropriately asserted only against the city defendants.  The amendments to 540 CMR 2.05 in no way alter the City's ability to regulate taxicabs or plaintiffs' ability to use their medallions.  The regulations simply set forth various options for motor vehicle registration within the Commonwealth at-large.  In fact, the amendments leave open the possibility that the City could enforce its local taxicab regulations against TNC drivers.  If the City chooses to do so, TNC drivers will need to comply with both the requirements imposed on them by 540 CMR 2.05 and Rule 403.  Thus, the Court concludes that there has been no action of the state defendants that can reasonably be construed as a "taking" of plaintiffs' property interests.

Second, plaintiffs have failed to convince this Court that medallion owners have a protected property interest in the market value of their medallions for purposes of the Takings Clause.  Here, plaintiffs have not asserted that a government entity has actually revoked their medallions or restricted their ability to use them.  Plaintiffs assert only that a government taking has occurred because the state regulations and the City's unwillingness to enforce Rule 403 against TNCs effectively reduces the market value of a City taxicab medallion.  As the Eighth Circuit Court of Appeals previously has held, however,

any property interest that [] taxicab-license holders'
        may possess does not extend to the market value of the
        taxicab licenses derived through the closed nature of
        the City's taxicab market.

Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis, 572 F.3d 502, 509 (8th Cir. 2009); see also Dennis Melancon, Inc. v. City of New Orleans, 703 F.3d 262, 273-74 (5th Cir. 2012) (taxicab license was only a "privilege" that existed as a direct "product of a regulatory scheme that vested the [c]ity with broad discretion to alter or extinguish that interest"). The Court agrees that the market value in a taxicab medallion, which is derived solely from the strict regulation of taxicabs in the City, cannot constitute a protected property interest in the context of the Takings Clause. See Dennis Melancon, 703 F.3d at 272 ("a protected property interest simply cannot arise in an area voluntarily entered into ... which, from the start, is subject to pervasive [g]overnment control, because the government's ability to regulate in the area means an individual cannot be said to possess the right to exclude.") (citations and internal quotations omitted).

Third, even assuming the existence of a protected property interest in a medallion's market value, any "reasonable investment-backed expectations" held by plaintiffs in their medallions must be significantly tempered in light of the decades-long, highly regulated nature of the taxicab industry

> any property interest that [] taxicab-license holders' may possess does not extend to the market value of the taxicab licenses derived through the closed nature of the City's taxicab market.

Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis, 572 F.3d 502, 509 (8th Cir. 2009); see also Dennis Melancon, Inc. v. City of New Orleans, 703 F.3d 262, 273-74 (5th Cir. 2012) (taxicab license was only a "privilege" that existed as a direct "product of a regulatory scheme that vested the [c]ity with broad discretion to alter or extinguish that interest"). The Court agrees that the market value in a taxicab medallion, which is derived solely from the strict regulation of taxicabs in the City, cannot constitute a protected property interest in the context of the Takings Clause. See Dennis Melancon, 703 F.3d at 272 ("a protected property interest simply cannot arise in an area voluntarily entered into ... which, from the start, is subject to pervasive [g]overnment control, because the government's ability to regulate in the area means an individual cannot be said to possess the right to exclude.") (citations and internal quotations omitted).

Third, even assuming the existence of a protected property interest in a medallion's market value, any "reasonable investment-backed expectations" held by plaintiffs in their medallions must be significantly tempered in light of the decades-long, highly regulated nature of the taxicab industry

within the City. See, e.g., Maine Educ. Ass'n, 695 F.3d at 154; Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 128 (1st Cir. 2009) (remarking on highly regulated hospital industry). Ultimately, purchasing a taxicab medallion does not entitle the buyer to "an unalterable monopoly" over the taxicab market or the overall for-hire transportation market. Minneapolis Taxi Owners, 572 F.3d at 508. Medallion owners must be cognizant of the possibility that new regulations or a decision to enforce Rule 403 by the City can alter the market value of a medallion. Maine Educ. Ass'n, 695 F.3d at 154.

Finally, the Court fails to perceive how the City's decision not to enforce Rule 403 against TNCs constitutes a "taking" of plaintiffs' property. The City's inaction undoubtedly permits new companies to offer services that directly compete with traditional taxicab services but simply allowing increased market competition, which may ultimately reduce the market value of a medallion does not constitute a taking.

Plaintiffs fail to proffer any legal support for their contention that the City's inaction constitutes a taking. To the contrary, courts have found that the government must act affirmatively to warrant the application of the Takings Clause. Nicholson v. United States, 77 Fed. Cl. 605, 620 (2007) ("The Court [of Federal Claims] has consistently required that an

affirmative action on the part of the [g]overnment form the basis of the alleged taking."); Valles v. Pima Cnty., 776 F. Supp. 2d 995, 1003 (D. Ariz. 2011) (discussing plaintiffs' failure to cite to any case law that supports the proposition that government inaction can amount to a taking).  The Court concludes, accordingly, that the City has taken no action that reasonably could be construed as a taking of plaintiffs' property.

### ii. Equal Protection Clause

#### a. Legal Standard

The Fourteenth Amendment's Equal Protection Clause "requires that all persons similarly situated ... be treated alike." Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 10 (1st Cir. 2013) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  Unless a fundamental right or a suspect classification is at issue,

> courts will uphold legislation that provides for differential treatment upon a mere showing of a rational relationship between the disparate treatment and a legitimate government objective.

Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 145 (1st Cir. 2001) (citation omitted).

Under rational basis review, social or economic legislation is entitled to a "strong presumption of validity." Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003)

(citation omitted).  Rational basis review is a "paradigm of judicial restraint" and simply requires that there be "any reasonably conceivable set of facts" justifying the disparate treatment.  FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313-14 (1993); see also Starlight Sugar, 253 F.3d at 145 ("In fact, the party challenging the legislation bears the burden of negating every conceivable basis which might support it.").

### b. Application

Plaintiffs concede that rational basis review applies in this case but nevertheless contend that the disparities in treatment between taxi companies and TNCs, which they contend are "de facto taxis", are arbitrary, irrational and fundamentally unfair.  Plaintiffs thus assert that this irrational economic disparate treatment between similarly situated for-hire transportation operators is unconstitutional.

Plaintiffs have not, however, convinced this Court that either (1) the recent amendments to 540 CMR 2.05 or (2) the City's decision not to enforce Rule 403 against TNCs runs afoul of the Equal Protection Clause.

First, it is not self evident that traditional taxicab operators and TNCs are similarly situated in the context of Equal Protection.  Plaintiffs' contention that both involve "driver, vehicle, passenger and payment" and therefore must be

treated equally does little to support its assertion that the two are similarly situated.

TNCs operate in a fundamentally different manner from traditional taxicabs.[1]  Taxicabs must be clearly identifiable as such from the street and are typically hailed by random customers who are unknown to the driver.  On the other hand, TNCs are structured so as to permit a customer to request a ride through his/her smartphone application.  The TNC connects the customer to a particular driver and payment is made by credit card directly through the application.  Many of those drivers use their own private vehicles.  Such a pre-arranged method of providing for-hire transportation, and its various other accompanying features, distinguishes it from traditional taxi service.  In summary, there are significant distinctions between their business models, of which the Court only scratches the surface, that permit state or local authorities to treat them differently without implicating the Equal Protection Clause.

Nevertheless, assuming for the sake of argument that traditional taxicabs and TNCs are similarly situated for purposes of the Equal Protection Clause, plaintiffs have failed to carry their burden of establishing that either the amended

---

[1] The same can be said of livery vehicles which have long been treated differently from taxicabs by (1) the state's motor vehicle registration requirements and (2) the City's decision not to enforce Rule 403 against them.

state regulations or the City's enforcement of Rule 403 only against taxicabs lacks a rational basis in the distinctions they draw.

The amendments to 540 CMR 2.05 draw distinctions in the various kinds of vehicles that can carry passengers for hire. By amending the regulations to include TNCs, the Commonwealth brings this new business model under at least a minimum level of scrutiny by providing a baseline of requirements.  Ultimately, plaintiff has not established that the Commonwealth's creation of a third registration option for vehicles providing small-scale, for-hire transportation services on behalf of TNCs is arbitrary or irrational.  To the contrary, the amendments seem to fill a regulatory gap with respect to this relatively new kind of for-hire transportation service.

Furthermore, the City's ongoing decision not to enforce Rule 403 against TNCs can be viewed as rational for at least two reasons.  First, the City has an interest in increasing the availability and accessibility of cost-effective transportation. See Joe Sanfelippo Cabs Inc. v. City of Milwaukee, 2014 WL 4546782, at *3 (E.D. Wis. Sept. 12, 2014).  Exempting TNCs from the restrictions of Rule 403 does just that by permitting an alternative transportation option to traditional taxicabs. Second, the City is actively engaged in a political process to determine the degree to which to regulate TNCs.  The City's

decision to allow that process to run its course before finalizing regulations is hardly irrational, especially in light of the City's awareness of the decision by the Commonwealth to amend 540 CMR 2.05 to account for TNCs and to establish a baseline of operational requirements.

The Court need go no further. It perceives a number of rational bases why traditional taxicabs and TNCs warrant disparate treatment by both state and local authorities. Plaintiff has accordingly failed to show a likelihood of success on the merits of it Equal Protection Clause claim.

### 2. Remaining Factors

Plaintiffs' inability to show a likelihood of success on the merits renders the remaining factors "matters of idle curiosity." Maine Educ. Ass'n Benefits Trust v. Cioppa, 695 F.3d 145, 152 (1st Cir. 2012) (additionally describing likelihood of success as the "touchstone of the preliminary injunction inquiry"). Nevertheless, the Court briefly addresses each of the remaining factors.

First, with respect to a showing of irreparable harm, plaintiffs contend that the influx of TNCs has caused taxicab operators to suffer "substantial economic harm." Plaintiffs alleged economic harm does not, however, threaten the very existence of their business and can be remedied by compensatory damages. It does not therefore rise to the level of being

irreparable. See <u>Vaqueria Tres Monjitas, Inc.</u> v. <u>Irizarry</u>, 587 F.3d 464, 486 (1st Cir. 2009).

Moreover, plaintiffs fail to establish that the balance of the harms weighs in their favor at this stage in the litigation or that the public interest is served by issuing an injunction. The challenged state regulations have already gone into effect and any economic consequences suffered by plaintiffs can be remedied if they ultimately prevail.

On the other hand, the recently-constituted Taxi Advisory Committee is actively considering rules and regulations for TNCs. To issue an injunction now would short-circuit that political process by mandating enforcement of Rule 403 against TNCs. Such intervention is unwarranted. The public interest is best served by the existence of a diverse and competitive market for transportation services, including both traditional taxicabs and TNCs. Restricting the development of that market at this early stage of the litigation would not be in the public interest.

The Court, nevertheless, anticipates that the City and its Taxi Advisory Committee will act expeditiously in determining the degree to which TNCs are to be regulated in Boston. During the pendency of this litigation, the Court expects the City to demonstrate a purposeful commitment to action by the prompt submission of recommendations to the Boston City Council.

Failure to do so will cause this Court to re-examine (1) the City's assertion that it is actively and seriously considering the promulgation of TNC regulations that will be fair to the taxi industry and ensure public safety and (2) plaintiffs' request for injunctive relief.

## ORDER

For the forgoing reasons, plaintiffs' emergency motion for a preliminary injunction (Docket No. 2) is **DENIED.**

**So ordered.**

       /s/ Nathaniel M. Gorton
       Nathaniel M. Gorton
       United States District Judge

Dated February 5, 2015