UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

_____
                                                    }
BOSTON TAXI OWNERS ASSOCIATION, INC.  }
RAPHAEL OPHIR AND JOSEPH PIERRE        }
     PLAINTIFFS                                     }
                                                    }
v.                                                  }
                                                    }
CITY OF BOSTON, MASSACHUSETTS,        }
WILLIAM EVANS, BOSTON POLICE          }        Civil Action No.: 1:15-cv-10100-NMG
COMMISSIONER, ANGELA M. O'CONNOR,  }
CHAIRMAN, JOLETTE A. WESTBROOK,      }
COMMISSIONER, ROBERT HAYDEN,          }
COMMISSIONER,                                }
DEPARTMENT OF PUBLIC UTILITIES,       }
STEPHANIE POLLACK, TRANSPORTATION  }
SECRETARY, MASSACHUSETTS               }
DEPARTMENT OF TRANSPORTATION,        }
     DEFENDANTS                                   }
_____}


## AMENDED COMPLAINT

### I.    Introduction

1. Plaintiffs are individuals and entities engaged in the licensed taxi industry in Boston. They have brought this case because the City of Boston (the "City") and agencies of the Commonwealth of Massachusetts (collectively the "Commonwealth") have arbitrarily violated their constitutional rights by applying burdensome and costly taxi regulations to them, while permitting so-called Transportation Network Companies (hereinafter "TNCs") (for example, Uber, Lyft, Sidecar and others) to compete without complying with those requirements or incurring the very large costs the City imposes on Plaintiffs.

Both the Plaintiffs and the TNCs engage in the very same business – driving individual passengers on demand for hire ("For-Hire Transportation").

2. Defendants are violating Plaintiffs' constitutional rights to just compensation, equal protection and due process by arbitrarily:

    a. The City requiring taxi operators to buy expensive City taxi licenses (known as "medallions") which have in recent years cost hundreds of thousands of dollars each, while destroying their most essential property right and much of their value by allowing the TNC's to operate without them.

    b. Defendants' imposing more onerous burdens on the taxi industry, as compared to the TNCs (also referred to herein as "de facto taxi companies"), even though both engage in the same business – For-Hire Transportation. Defendants require members of the taxi industry to spend hundreds of thousands of dollars per taxi to engage in the taxi business and to comply with its vast set of regulations, while Defendants permit the de facto taxi companies to compete in the same business without any particular regulation.

    c. Imposing extensive, costly and burdensome safety-related obligations on the taxi industry, but not on the TNCs.

3. The Plaintiffs have brought this lawsuit because the Defendants  now permit by law the de facto taxi companies to operate without complying with the taxi regulations even though they engage in the same business as Plaintiffs, For-Hire Transportation (i.e., they provide passenger transportation in cars for money).

4. There are proposed changes to an existing regulation, 540 CMR 2.00 (Exhibit A), that if implemented and enforced by the Defendants, will create an  irrational,  two tiered

regulatory system that unconstitutionally harms the economic property interests of taxicab medallion owners and drivers.  The proposed regulation, allows TNC's, and their drivers to operate in an essentially market system with little to no oversight while continuing to subject licensed taxicab medallion owners and licensed drivers to stringent, economically oppressive regulations.  In particular, the new regulation allows TNC's to use practically any vehicle, charge any fare and not obtain commercial insurance, while requiring taxicab medallion owners and drivers to use specific vehicles, charge set rates, obtain certain insurance and incur mandated expenses.  For example, a TNC driver, using a tablet or cell phone app, may pick up a rider using a private vehicle and charge practically any price.  If a taxicab driver, using a similar app, picks up that same rider, the taxicab driver must be in an approved vehicle and must charge the passenger no more than the city-approved rate.   This irrational economic disparity violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

5. Also, under the Due Process Clause, the proposed regulation impermissibly harms the taxicab medallion owners' property interests previously created by the City of Boston and the Commonwealth of Massachusetts by eliminating entirely any cap on the number of taxicab medallions (effectively rendering them valueless) and prohibiting the transfer of taxicab medallions.   Having previously limited the number of taxicab permits and required taxicab medallion owners to go to a secondary market and spend thousands of dollars (sometimes tens of thousands or hundreds of thousands) to obtain a medallion, the City has now irrationally destroyed all value of those medallions.   The City recently

conducted a study using Nelson Nygaard[1], in which it was determined that there is no need to issue additional medallions (Exhibit B).  The proposed regulation is fashioned and drafted in an arbitrary and capricious fashion, and will cause economic harm to the current taxicab medallion owners.

6. If the regulation is not implemented, the same harm persists to the taxicab medallion owners and drivers, as the Defendants continue to allow the TNCs to operate within the City and the Commonwealth without requiring the TNCs or their drivers to abide by the state law, city ordinances and the Hackney Carriage Rules and Regulations.

7. The Plaintiffs have invested substantial capital in complying with the City rules and state laws, developed over the last eighty years, that protect consumers, ensure public safety and provide non-discriminatory service.

8. The TNCs have created an illegal transportation system that violates state law and Boston City ordinances.

9. The Plaintiffs seek declaratory and injunctive relief against the Defendant officials of the agencies of the Commonwealth and the City and monetary damages against the City.

## II. PARTIES

10. Plaintiffs and Defendants are as follows:

a. Joseph Pierre, a taxicab medallion owner and driver with a usual address at 14 Wall Street, Apartment 2, Brockton, Massachusetts 02301.

---

[1]Nelson Nygaard is an independent firm that is internationally recognized as committed to developing transportation systems that promote vibrant, sustainable, and accessible communities.  The firm was retained by the City of Boston to conduct this study.

b.  Raphael Ophir, an owner of two taxicab medallions with a usual address at 111 Perkins Street, #287, Jamaica Plain, Boston, Massachusetts 02130

c.  Boston Taxi Owners Association, Inc., a Massachusetts non-profit corporation with a principal place of business at 111 Perkins Street, #287, Jamaica Plain, Massachusetts 02130.  This entity represents individuals who collectively own hundreds of taxicab medallions in the City of Boston.

d.  All Plaintiffs are directly and detrimentally impacted by the proposed regulation and/or lack of enforcement of existing taxicab laws as to the TNC's and their drivers.

e.  Defendant, City of Boston is a Massachusetts municipality with a principal place of business located at City Hall, Boston, Massachusetts.  The City of Boston, through the Police Commissioner, has the legal authority to regulate the hackney carriage industry.

f.  Defendant, William Evans, Police Commissioner, has the legal authority and obligation per state statute and local laws to regulate the hackney carriage industry.

g.  Defendants, Angela M. O'Connor, Chairman, Jolette A. Westbrook, Commissioner, and Robert Hayden, Commissioner, are officials of the Department of Public Utilities, Commonwealth of Massachusetts, a state agency named in the proposed regulation with the authority, through said officials, to oversee the TNC's and their drivers (the "DPU Officials").

h.  Defendant, Stephanie Pollack, Transportation Secretary, is an official of the Massachusetts Department of Transportation, Registry of Motor Vehicles, a state

agency which has proposed the amendments to 540 CMR 2.00 (the "MassDOT Official").

### III. FACTUAL ALLEGATIONS

11. The Boston taxi industry is highly regulated by state statutes, city rules and ordinances and multiple agreements that specify how medallion owners, radio associations, drivers and credit card processors must operate together.  These legal controls are designed to ensure that taxi services in Boston will operate safely, reliably and without discrimination.

12. The Massachusetts legislature has given the City of Boston authority to regulate all vehicles "used or designed to be used for the conveyance of persons for hire from place to place within the City of Boston." <u>See</u> M.G.L. c. 40, § 22 and M.G.L. c. 159, Massachusetts Session Laws of 1930, Chapter 392 of the Session Laws of 1963, Chapter 386.

13. The City, pursuant to the powers vested in it by the Massachusetts legislature, granted authority to the Police Commissioner ("Commissioner") of the Boston Police Department ("BPD") to enact Rule 403, the Hackney Carriage Rules and Flat Rate Handbook, which applies to all vehicles "*<u>used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston</u>*." (Hackney Carriage Rules and Flat Rate Handbook, Boston Police Department, Rule 403.1.I.a.).  The Taxi Rules explicitly state that they are intended to be a "comprehensive and definitive listing of all regulations affecting the Hackney Carriage industry in the City of Boston…" (Taxi Rules Section 1(II)(c).) [Emphasis Added] (Exhibit C, Rule 403).

14. The current version of Rule 403 is the product of decades of revisions, designed to protect consumers, ensure public safety, safeguard competition, and provide non-discriminatory taxi services to all areas of the city and to the elderly and disabled.  The plaintiffs and all medallion owners operating in Boston have invested significant capital and resources to develop systems of infrastructure that meet Rule 403's broad ranging requirements.

15. The rules are elaborate, highly detailed and very restrictive controlling virtually every aspect of the taxi businesses.

16. Boston's taxi regulations are designed to ensure that Boston's taxi services are safe, reliable and non-discriminatory.

17. The City issues a limited number of taxi licenses, called taxi medallions.  A taxicab cannot operate in Boston without one of the 1825 city-issued taxi medallions.

18. Medallion owners must file annual reports of their financial condition, disclosing all liens, mortgages and judgments, can be required to provide tax returns and must provide the Inspector of Carriages with the names of every individual with an ownership interest in the medallion.

19. The de facto taxi companies are not subject to any of these requirements or qualifications and know virtually nothing about the financial stability, citizenship or ownership record of their drivers.

20. Medallion owners must have taxicabs that meet strict requirements concerning vehicle age, condition and installed equipment.

21. The de facto taxi companies are not subject to any of these requirements.

22. In addition, the City requires taxi owners to pay large sums for the "exclusive" license to engage in the business of For-Hire Transportation. For decades, taxi owners accepted these burdens and expenses as part of a quid pro quo with the City for the exclusive rights granted. The City promised, in return, that taxi owners, and the taxi affiliations and drivers who operate taxis, would have the exclusive right to provide For-Hire Transportation to individual passengers. In reliance on the City's decades-long promise of exclusivity, taxi owners have invested hundreds of millions of dollars.

23.   The Plaintiffs have a property interest in their taxi medallions.

24. Every taxi driver must have a Hackney Carriage Driver's License and comply with the extensive rules of conduct promulgated by the City of Boston (for example, requirements for dealing with handicapped passengers, allowed fares and charges, anti-discrimination requirements and prohibitions on cell phone use).

25. The de facto taxi drivers do not have to comply with the same rules and requirements.

26. Each taxi driver is also required to carry expensive primary commercial liability insurance that applies whenever taxis are picking up, carrying or looking for passengers, or even when off duty.

27. The de facto taxi drivers are not required to carry the same such insurance.

28. A standard insurance policy for a car that is not transporting passengers contains an exclusion for transporting people for hire and effective 6/14/2014 each policy includes special page warning for no coverage if private cars are involved in transporting passengers for hire.  So, most de facto taxi drivers are operating with insurance that excludes the use and for which coverage would not apply (Exhibit D, Affidavit of Raphael Ophir).

29. The hallmark of the marketplace in transportation services created by the heavily regulated industry had been competition on a level playing field.

30. Taxi owners and drivers worked in a competitive environment, all subject to the same regulations – until the advent of unregulated providers that gives rise to this Complaint.

31. The For-Hire Transportation business consists of four simple elements, whether the service is provided by a taxi or a TNC: a driver, a vehicle, a passenger and payment. These elements do not depend on how the connection between driver and passenger is made, whether visual (by street hail or taxi queue), or electronic (by telephone, smartphone or web site).

32. For decades the City heavily regulated all For-Hire Transportation providers under uniform rules. The rules were designed to protect the public, regulate traffic, address congestion and provide public service.

33. The de facto taxi companies (such as UberX, Lyft and Sidecar) do exactly the same thing that traditional taxi companies do. They dispatch drivers to passengers who pay fares based on the time and distance traveled. That the de facto taxi companies dispatch the car and driver via smartphone does not distinguish their business activity from that of traditional taxis, which also now use smartphones as one means of connecting driver and passenger.

34. TNCs are an unlicensed taxi service.

35. All TNC vehicles must, therefore, be considered "hackney carriages" under Boston's regulations, and cannot operate legally without medallion and hackney-licensed driver. The Taxi Rules are clear:

> *In the City of Boston, <u>no person, firm, or corporation</u> driving or having charge of a taxicab or other private vehicle <u>shall offer the vehicle for hire for the purpose of transporting, soliciting and/or picking up a passenger</u> or passengers unless said person is licensed as  a hackney driver and said vehicle is licensed as a hackney carriage by the Police Commissioner.*  (City of Boston Code 16-15.05: Vehicle for Hire Ordinance) (Appendix I to Taxi Rules) [Emphasis Added].

36. Every TNC driver operating in the City of Boston must, under the provisions of the Vehicle for Hire ordinance quoted above have a medallion. None of them do, and all TNC drivers in Boston are, therefore, operating illegally.

37. This massive illegal operation puts the public and consumers at risk in many ways.

38. Use of a smartphone app does not change the nature of the business. It does not alter the need for uniform rules for all who engage in it. Use of an app merely provides an alternative means of dispatch and payment.  The service provided remains For-Hire Transportation. An app does not make a car safer, qualify or train a driver, protect the passenger, or insure the public when accidents occur. Because cars, drivers and passengers exist and travel in the real world, not the virtual world, the same public safety concerns exist regardless of how passenger and driver connect. Therefore, the rules governing the activity should be substantially the same for all.

39. The Taxi rules protect the public from dangerous cab drivers by requiring hackney license applicant's to meet seventeen criteria before they can even apply for a license, including:

1. be twenty-one (21) years of age or older;
2. pass a standard examination demonstrating the ability to speak, read, write and understand the English Language;

3.  participate in Hackney Carriage testing and training as determined by the Inspector of Carriages;

4.  have an original Birth Certificate, Alien Card, Asylum Document, US Passport or Naturalization Papers;

5.  not have a Hackney Carriage Driver's License that is revoked or suspended in any jurisdiction;

6.  have a valid Massachusetts Driver's License;

7.  have had a Driver's license in the United States for at least two (2) years;

8.  not have been adjudged a Habitual Traffic Offender, as defined by Massachusetts General Law Chapter 90 section 22F, or the equivalent in any jurisdiction, within the past five (5) years;

9.  not have any outstanding or unresolved driving infractions which could result/in the applicants Driver's license being suspended or revoked in any jurisdiction;

10. not have had his or her Driver's License suspended for five (5) or more Surchargeable Incidents, as defined by Chapter 211 of the Code of Massachusetts Regulations section 134, or the equivalent in any jurisdiction, within  past five (5) years;

11. not have more than four violations of the Traffic Laws and/or At-Fault Accidents as, defined by Chapter 211 of the Code of Massachusetts Regulations Section 134 or an equivalent department in the last three (3) years (violations and accidents occurring on the same date will count as only one) in any jurisdiction;

12. not have any Operating Under the Influence of drugs or alcohol convictions or dispositions under Massachusetts General Law Chapter 90 section 24D within the past five (5) years or the equivalent in any jurisdiction;

13. not have any felony convictions within the last five (5) years in any jurisdiction;

11

14. not have any drug convictions in the last five (5) years in any jurisdiction;

15. not have any dispositions for a criminal offense, in any jurisdiction, that would result in the, denial of a license, including admissions to sufficient facts or continuance of an offense without resolution, unless the circumstances of such incident are, reviewed by the Inspector of Carriages as to the specific facts and circumstances and the applicant is thus approved by the Inspector of Carriages;

16. not be required to register as a sex offender in any jurisdiction; and

17. not have any outstanding or unresolved criminal court cases in any jurisdiction which could result in the license being denied if the Applicant was convicted of the alleged offense.

(Hackney Carriage Driver Standards, Taxi Rules Appendix I).

40. The de facto taxi operators do not have to meet the strict criteria set forth above, as the DPU Officials and MassDOT Official have implemented amendments to 540 CMR 2.00 which create a separate category for TNC's and do not require their compliance with the taxi rules and regulations.

41. Once drivers have a license they must abide by a strict standard of rules, requiring them not to possess alcohol in their vehicle, not to talk on a cell phone, not to smoke or permit smoking.  These rules are enforced by the Inspector of Carriages, who can conduct hearings on complaint and suspend or revoke a license.

42. The de facto taxi operators do not have to meet any such requirements, as the DPU Officials and MassDOT Official have implemented amendments to 540 CMR 2.00 which create a separate category for TNC's and thereby do not require TNC's to comply with the taxi rules and regulations.

43. The City requires taxi operators to invest in and operate only cars that are of a certain age and body style, and are subject to regular City inspections. But the Defendants allow de facto taxi companies to deploy private drivers in their own personal cars of any age or condition with no inspection requirement.

44. The City requires that all taxis have a protective barrier (referred to as a partition) of metal and lexan between the front and back seats.  These barriers not only protect drivers from assault and theft but also protect the driver from impaired passengers that may interfere with the driver's ability to operate the taxi thereby causing an accident.

45. The de facto taxi companies have no such requirement.

46. Every Boston taxi must be equipped with an Inspector approved GPS system that gives the Boston Police Department internet access, both in real time and for a year after any trip, to the location of every taxi, the pick-up and drop off points and how the passenger paid and the exact route followed.  Every taxi must also have a panic button.

47. The vehicles used by the de facto taxi companies do not have to follow these requirements.

48. Unlicensed taxis pick up customers at Logan Airport, without having to pay the fee which lawful taxis, limousines, and car service vehicles have to pay for a ticket that would authorize them to pick up a customer.

49. The City requires taxi operators to maintain expensive primary commercial liability insurance that applies at all times to the taxis. But the de facto taxi companies are not required to carry such commercial insurance and are knowingly permitted to give uninsured rides to unwary Bostonians and visitors without insurance.

50. The City sets meter rates for traditional taxis that apply to all taxi rides, even when taxis accept passengers via a smartphone dispatch in an identical fashion as the de facto taxis. Yet the City permits the de facto taxi companies to charge any rate, and to impose large surcharges during times of high demand.

51. The City requires many owners of taxis to buy and operate very expensive wheelchair accessible vehicles, but it imposes no such obligation on the de facto taxi companies. Such arbitrary favoritism damages the Plaintiffs by reducing their revenues. It also seriously handicaps their ability to compete fairly against the de facto taxi companies to recruit drivers, which threatens to destroy their businesses entirely.

52.   The Taxi Rules Anti-Discrimination Clause states that:

> A Hackney Carriage Driver may not refuse any passenger on the basis of race, sex, religion, disability, sexual orientation, national origin, or location of the passenger's pick-up or destination in any circumstance.

53. The de facto taxi drivers working for a TNC can ignore this requirement without any adverse consequence.

54. Boston taxi drivers are required to accept multiple forms of payment, including cash, credit cards, vouchers, and Boston Taxi Industry Elderly Program (BTIEP) coupons, which allow customers, who are elderly, handicapped, disabled or suffer from cancer to pay discounted rates (Taxi Rules, Section 9.II.b; Taxi Rules, Section 7.1.).

55. The de facto taxi drivers working for a TNC can ignore this requirement without any adverse consequence, and in fact, most are forced through the TNC to accept only credit card payments.

56. The arbitrary favoritism is particularly harmful to individual owner-operators like Plaintiff Joseph Pierre, an immigrant taxi driver who, in reliance on the promises inherent in the City Taxi Regulations, pursued the American Dream by taking the substantial personal risk of acquiring a medallion and buying a taxi. Had he openly flouted the law by providing For-Hire Transportation in his own car, without buying a medallion, in violation of the City Taxi Regulations, the City could and would have impounded his car and fined him. Instead, Mr. Pierre obeyed the law and made the huge investment the City mandated as a pre-condition to engaging in the business (Exhibit E, Affidavit of Joseph Pierre).

57. The City, DPU Officials, and the MassDOT Official have now destroyed Pierre's property rights and permitted the de facto taxi companies to flout the law with open impunity by deploying an invasion of unlicensed cars and drivers with no requirement of any medallion or other meaningful investment or compliance with the City Taxi Regulations. As a result, Pierre's revenue has declined substantially, impairing his ability to honor his continuing obligations associated with paying for the medallion, the license fees and the insurance obligations the City continues to impose upon him (but not upon the de facto taxi companies), as well as his ability to support his family.

58. While the Equal Protection Clause often permits government to draw distinctions that are rationally related to legitimate governmental interests, the distinctions summarized above and detailed below do not pass constitutional muster. They are arbitrary, fundamentally unfair and unconstitutional. Defendants have arbitrarily forced participants in the same business to operate by very different rules.

59. The constitutional protections of equal protection and due process rest on bedrock principles of fundamental fairness. Under our constitutional system, the government must apply reasonable rules fairly to similarly situated persons. People engaging in the same business activity must be held to the same rules. The rules must rationally relate to a legitimate governmental objective. Defendants' disparate treatment of Plaintiffs and TNCs violates all of these principles.

60. Principles of fundamental fairness also animate the constitutional right to just compensation when the government takes private property. That right is particularly important where, as here, the government itself created the property right, sold it to private parties and developed a system under which hundreds of private parties were induced and required by government to invest and risk hundreds of millions of dollars as a precondition to engaging lawfully in business. These constitutional protections – equal protection, due process and just compensation – allow people to take investment risks and allow businesses to compete fairly.

61. Certain transportation providers began to offer taxi services in Boston in open and blatant disregard of applicable City taxi ordinances and regulations, including the law requiring medallion ownership.

62. The de facto taxi companies operate unlicensed taxi services in open violation of City law to which Defendants deliberately turn a blind eye.

63. It has disrupted long-settled expectations and imposed very serious adverse consequences on the Plaintiffs, who engaged in the taxi business in costly reliance upon and in compliance with the market created by the City Taxi Regulations.

64. The Defendants' actions also deprived Plaintiffs of the fundamental property right that the City expressly granted with the sale of the medallion: the exclusive right of medallion owners to provide For-Hire Transportation in the City.

65. This deprivation has seriously devalued the Plaintiffs' medallions.

66. Requiring the TNC's to comply with the taxicab regulations is not only necessary to protect the health, safety and welfare of the public, but ensures the "same level playing field" for all taxicab operators, regardless of whether the rides are being generated by telephone, hailing a taxicab on the street or use of an internet app-based system.

67. This irrational economic disparity between similarly situated operators for hire violates the Due Process and Equal Protection clauses of the Fourteenth Amendment of the U.S. Constitution.

## COUNT I
## DECLARATORY JUDGMENT

68.   The allegations set forth above are re-alleged and incorporated herein.

69. The proposed amendments to the existing regulation, 540 CMR 2.00, are unconstitutional in that they violate the Due Process and Equal Protection clauses of the Fourteenth Amendment of the U.S. Constitution.

70. The changes to 540 CMR 2.00 relating to TNC's, are invalid, null and void to the extent the regulation infringes on the constitutional rights of the Plaintiffs.

71. The rights, duties and legal privileges of the Plaintiffs are affected, impaired and threatened because the Defendants are allowing TNC's to operate without complying with the state and local law.

72. Plaintiffs are entitled to a declaratory judgment to determine the validity of the proposed regulation, 540 CMR 2.00 and specifically declaring it invalid as it pertains to TNC's.

73. Plaintiffs are entitled to a declaratory judgment that the Transportation Network Drivers are required to comply with state and local laws pertaining to hackney carriage operators and that, until such compliance, they cannot engage in any form of "For-Hire Transportation".

74. There exists a substantial, present and justifiable controversy between the Plaintiffs and the Defendants with respect to the validity of the proposed regulation and whether or not the existing law applies to TNC's and their drivers.

**COUNT II**
**INJUNCTIVE RELIEF**

75.   The allegations set forth above are re-alleged and incorporated herein.

76. Because the amendments to the regulations pertaining to Transportation Network Companies and Drivers set forth in 540 CMR 2.00 are invalid, Defendants must be permanently enjoined from enforcing those regulations.

77. If the revised regulations are invalid, the Court must issue an order forcing the City to enforce the current Hackney Carriage rules as to the TNCs.

**COUNT III**
**MONETARY DAMAGES**

78.   The allegations set forth above are re-alleged and incorporated herein.

79. In the absence of appropriate and timely injunctive relief, the Plaintiffs are entitled to compensatory and special damages in an amount which will fairly and reasonably compensate them for the harm caused by the Defendants, in an amount to be determined at a trial of this matter.

## COUNT IV
## TAKINGS CLAUSE

80.   The allegations set forth above are re-alleged and incorporated herein.

81. The City has violated the Takings Clause because medallions are property under Massachusetts law, medallion owners, and lenders holding security interests in medallions, own property that may not be taken by the Commonwealth or the City without payment of just compensation.

82. Before the Commonwealth and the City allowed the invasion of the de facto taxi companies, if someone wanted to provide taxicab services in the City, the City required that he or she buy or lease a medallion and comply with the City Taxi Regulations. In return, the medallion owner received the exclusive right to provide taxi services in the City.

83. A hallmark of property is the right to exclude, and exclusivity was an essential element of the medallion owners' property rights and determined the value of those rights.

84. Without compensation to the medallion owners or the lenders holding security interests in the medallions, the Commonwealth and the City have permitted and continue to permit the de facto taxi companies to usurp and trespass upon the exclusive property rights of medallion owners by providing those services without buying or leasing medallions or complying with the City Taxi Regulations. The Commonwealth and the City have thereby taken exclusive rights from medallion owners and transferred them to the de

facto taxi companies without any compensation, let alone the just compensation that the Takings Clause requires.

## COUNT VI
## DUE PROCESS/EQUAL PROTECTION

85.   The allegations set forth above are re-alleged and incorporated herein.

86. Defendants' unequal treatment of the Plaintiffs and the de facto taxi companies violates the Equal Protection Clause of the Fourteenth Amendment by permitting the de facto taxi companies to engage in the taxi business without incurring the costs and limitations of complying with applicable law, while requiring the Plaintiffs and others similarly situated to comply with the City's extensive and costly taxi regulations, including the requirements to: purchase a medallion; pay annual license fees; maintain commercial liability and worker's compensation insurance; operate only newer, regularly inspected vehicles; satisfy driver-licensing requirements, and pay thousands of dollars annually per medallion in City and State fees and taxes.

87. Among the many ways in which Defendants have created an unlevel and unfair playing field is its disparate treatment of the Plaintiffs and the de facto taxi companies concerning automobile liability insurance.

88. The disparate treatment regarding fares and fees lacks any rational basis, especially for rides arranged in advance through smartphone apps, and adds to the competitive disadvantage Defendants are imposing upon the Plaintiffs.

89. Defendants' disparate treatment regarding driver qualifications lacks a rational basis.

90. Defendants' disparate treatment regarding vehicle age, condition, inspections and safety features lacks a rational basis, and adds to the competitive disadvantage the City is imposing upon the Plaintiffs.

91. The disparate treatment regarding accessibility and payment lacks a rational basis, and adds to the competitive disadvantage Defendants are imposing upon the Plaintiffs.

92. The City's refusal to require the de facto taxi companies to comply with these accessibility, availability and anti-discrimination rules has arbitrarily imposed greater obligations on the Plaintiffs as compared to the de facto taxi companies, thereby exacerbating the competitive advantages they already garner from the City's arbitrary refusal to regulate them.

93. The DPU Officials and the MassDOT Official have no rational basis for the implementation or enforcement of the amendments to 540 CMR 2.00, as it results in an unequal application of two sets of laws to persons engaging in substantially the same business activity: applying the City Taxi Regulations to Plaintiffs while applying the far less restrictive and costly Regulation to the de facto taxi companies.

94. As described herein, the DPU Officials' decision to promulgate a new regulation to the TNCs is not rationally related to any legitimate governmental interest.

95. The Plaintiffs are suffering and will continue to suffer direct and tangible injury and damages from Defendants' actions and inactions in that, without limitation, (i) the market and collateral value of the medallions and their marketability are being or will be reduced by the unequal application of the law, (ii) all who operate taxis directly or lease vehicles with medallions to drivers are being injured in that the revenues derived from their lawful

operations have been and will continue to be reduced as a result of the de facto taxi companies' operation.

## COUNT VI
## BREACH OF CONTRACT

96.    The allegations set forth above are re-alleged and incorporated herein.

97. The hackney carriage rules coupled with the reliance on the state laws and local regulations and their expenditure of very large sums of money to purchase medallions and operate the Plaintiffs' taxi-related businesses, including the businesses of dispatching taxis, operating taxi affiliations, leasing the right to operate taxis pursuant to licenses from the City, give rise to contractual rights on the part of the Plaintiffs.

98. The resulting licenses to operate affiliations, dispatch services and to own medallions and the right to operate taxis pursuant to the ownership of licenses, give rise to a binding contractual relationship between the City and the Plaintiffs.

99. The City has materially breached the Contract by allowing the de facto taxi companies to offer services that are virtually identical to the services offered by the Plaintiffs without requiring that they obtain licenses or otherwise comply with comparable law and regulations.

100.  The City's breach of the contract has damaged the Plaintiffs by causing loss of revenues and profits, and reducing the value of their businesses, assets and their taxi licenses.

## COUNT VII
## PROMISSORY ESTOPPEL

101.  The allegations set forth above are re-alleged and incorporated herein.

102.  For many years the City has sold and taxed the sales of medallions as part of the comprehensive regulatory program it established and fostered that, among other things, establishes the total number of medallions and guarantees medallion owners the exclusive right to provide taxi services in Boston.

103.  This regulatory program constitutes the City's promise to medallion owners that, subject to compliance with the obligations under the City Taxi Regulations, the City will provide the exclusive rights and benefits summarized above that include: (i) exclusivity, i.e., only medallion owners will be permitted to operate taxis, (ii) market support, i.e., the City will cap the total number of medallions so as not to impair materially the property right in or value of medallions, and (iii) enforcement, i.e., the City will impound and fine vehicles violating the exclusivity promise by providing taxi services without medallions.

104.  Plaintiffs foreseeably and detrimentally relied on these promises by collectively investing substantial sums of money to purchase medallions, incur debt to finance such purchases, and/or create and operate taxi affiliations.

## COUNT VIII
## EQUITABLE ESTOPPEL

105.  The allegations set forth above are re-alleged and incorporated herein.

106.  The City's enactment and past enforcement of the City Taxi Regulations, as well as its issuance of medallions, constitute affirmative acts by the City upon which the Plaintiffs reasonably relied to their detriment as summarized in the preceding paragraph. The City is estopped from creating the de facto system under which the de facto taxi companies are allowed to provide taxi services without being required to comply with

the obligations imposed upon Plaintiffs, who undertook such obligations in reliance on the exclusive, regulated medallion system.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs as follows:

A. Declare the proposed changes to 540 CMR 2.00 pertaining to Transportation Network Companies unconstitutional in violation of the Due Process and Equal Protection clauses of the Fourteenth Amendment;

B. Declare that the existing state and local laws, including the Hackney Carriage Rules, applicable to the Transportation Network Companies are valid, and issue an order requiring the Commonwealth and the City to enforce the laws against the TNCs.

C. Issue a preliminary injunction enjoining the Defendants from enforcing the changes to 540 CMR 2.00, as they relate to Transportation Network Companies;

D. Issue a permanent injunction enjoining the Defendants from enforcing the changes to 540 CMR 2.00, as they relate to Transportation Network Companies;

E. Grant Plaintiffs compensatory and special damages in an amount which will fairly and reasonably compensate them for the harm caused by the Defendants, in an amount to be determined at a trial of this matter;

F. Grant Plaintiffs any and all such other legal and equitable relief as the Court deems just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Respectfully submitted,
By the Plaintiffs,


_____/s/ Jenifer M. Pinkham_____
Jenifer M. Pinkham
BBO #658031
Tiffany L. Stichel
BBO #672713
Schlossberg, LLC
35 Braintree Hill Office Park
Suite 204
Braintree, MA 02184
781.848.5028
jpinkham@sabusinesslaw.com


Dated:  March 6, 2015

G:\Boston Taxi Owners Association, Inc.-BY007\BTOA v. City of Boston-Comm of Mass-004\Docs\Amended Complaint 030315.docx


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 6, 2015.



_____/s/ Tiffany L. Stichel_____
Tiffany L. Stichel