**United States District Court**
**District of Massachusetts**

|  |  |
|---|---|
| BOSTON TAXI OWNERS ASSOCIATION, INC., RAPHAEL OPHIR and JOSEPH PIERRE     )<br>)<br>)<br>)<br>)<br>        Plaintiffs,     )<br>)<br>        v.     )<br>)<br>CITY OF BOSTON, BOSTON POLICE     )<br>COMMISSIONER WILLIAM EVANS,     )<br>CHAIRMAN ANGELA M. O'CONNOR,     )<br>COMMISSIONER JOLETTE A.     )<br>WESTBROOK, COMMISSIONER ROBERT     )<br>HAYDEN, DEPARTMENT OF PUBLIC     )<br>UTILITIES, and MASSACHUSETTS     )<br>DEPARTMENT OF TRANSPORTATION     )<br>SECRETARY STEPHANIE POLLOCK,     )<br>)<br>        Defendants.     )<br>) | Civil Action No.<br>15-10100-NMG |

**MEMORANDUM & ORDER**

GORTON, J.

In this action, the Boston Taxi Owners Association, Inc., along with two individual Boston taxicab license owners, Raphael Ophir and Joseph Pierre (collectively, "plaintiffs"), challenge city and state regulations with respect to the registration and operation of vehicles providing transportation-for-hire services. Plaintiffs bring claims on federal constitutional, state contract and equitable grounds. The suit is brought against the City of Boston and Boston Police Commissioner William Evans (collectively, "the city defendants") and against

Angela M. O'Connor, the Chairman of the Massachusetts Department of Public Utilities ("DPU") and Jolette A. Westbrook and Robert Hayden, DPU Commissioners (collectively, "the DPU defendants"), and Stephanie Pollack, the Secretary of the Massachusetts Department of Transportation ("MassDOT") (collectively, "the state defendants").

Recent amendments to the state regulations establish standards for the registration of motor vehicles providing services for so-called Transportation Network Companies ("TNCs"), such as Uber, Lyft and Sidecar. See 540 CMR § 2.05. Plaintiffs contend that those amendments create an arbitrary, two-tiered system between TNCs and taxicabs that violates plaintiffs' constitutional and contract rights.  Moreover, they argue that the continuing failure of the City of Boston and Commissioner Evans to enforce existing local regulations governing the Hackney Carriage industry against TNCs also violates plaintiffs' constitutional and contract rights.

Pending before the Court are three motions to dismiss filed by the City of Boston, William Evans, and the state defendants. Also pending before the Court is plaintiffs' second motion for a preliminary injunction against the City of Boston.

I.    **Background**

    A.   **City Regulation of the Taxi Industry**

The main source of regulation for the City of Boston ("the City" or "Boston") taxicab industry is its Police Commissioner ("the Commissioner"), who is authorized by state statute to regulate the taxi business in Boston.  In exercising that authority, the Commissioner requires anyone who drives or is "in charge of" a "hackney carriage" (i.e. taxicab) to possess a license known as a "taxicab medallion."  There are currently 1,825 city-issued medallions.

In 2008, the Commissioner issued a comprehensive set of taxicab regulations under Boston Police Department Rule 403 ("Rule 403").  Rule 403 defines a taxicab as "[a] vehicle used or designed to be used for the conveyance of persons for hire from place to place within the City of Boston."  Since its inception, Rule 403 has not been applied to livery vehicles, despite the fact that the rule's broad definition of a taxicab would seem to encompass them.

The rule requires all taxicab operators, inter alia, to possess a medallion, maintain a properly equipped and functioning taxicab, display a hackney carriage license at all times, refrain from cell phone use while operating a taxicab and belong to an approved dispatch service or "radio association."

Rule 403 also sets out the approved manner in which a taxicab in the City can engage customers.

Beginning in 2012, companies such as Uber, Lyft and Sidecar began operations in Boston and surrounding communities.  The cellular phone app-based, for-hire transportation services have quickly gained popularity and serve as an alternative to traditional taxicab or livery services.  The new companies rely, to varying degrees, on drivers who provide pre-arranged transportation services in their own private vehicles.

The City of Boston has yet to issue regulations specifically targeted at such companies, nor does it enforce Rule 403 against them.  In October, 2014, however, the City convened a "Taxi Advisory Committee" which is authorized to examine the City's regulatory framework of for-hire transportation services and to develop new policies to account for these relatively new entrants into the market.

   B.    **State Regulation of Motor Vehicle Registration**

Overlaying the specific city regulations for taxicabs, MassDOT has enacted statewide requirements for the registration of all motor vehicles. 540 CMR § 2.05.  Prior to a set of amendments enacted in 2015, 540 CMR § 2.05 outlined two ways in which small-scale vehicles (designed to carry 15 or fewer passengers) need to be registered in order to carry passengers

for hire.  The first kind of registration pertained to

"taxicabs", defined as

> any vehicle which carries passengers for hire, and which
> is licensed by a municipality pursuant to M.G.L. c. 40,
> § 22 as a taxicab.

The second kind of registration was for a "livery vehicle",

defined as

> any limousine or other vehicle which ... carries
> passengers for hire ... [but] is not required to obtain
> a taxicab license pursuant to M.G.L. c. 40, § 22.

As of January 16, 2015, MassDOT revised 540 CMR § 2.05 to

include a third alternative for the registration of small-scale

vehicles used to carry passengers for hired transportation.

Under this third option, private passenger vehicles can be

registered and used as "personal transportation network

vehicles" on behalf of Transportation Network Companies, or

TNCs.  TNCs are defined as

> entit[ies] operating in Massachusetts that, for
> consideration, will arrange for a passenger to be
> transported by a driver between points chosen by the
> passenger.

The amended regulations also restrict the way in which

drivers using their own private vehicles on behalf of a TNC can

solicit customers.  Specifically, the TNC must have pre-arranged

for the driver to provide transportation services and the driver

is not permitted to solicit or accept an on-demand ride,

otherwise known as a "street hail" or "hail pick-up."  Thus, the

amended regulations broadly define TNCs and permit TNC drivers to use their own private vehicles so long as they register the vehicle as a "personal transportation network vehicle" and provide transportation services only to passengers that the TNC pre-arranged.  Accordingly, the new regulations provide some restrictions on the way in which companies such as Uber, Lyft and Sidecar operate within the Commonwealth.  The new state regulations do not address whether TNC drivers must obtain taxi medallions, which is a matter of local regulation.

The amendments to 540 CMR § 2.05 also set standards for TNC drivers' driving records.  Further, although the regulations were promulgated by MassDOT, they instruct DPU to regulate TNCs by (1) requiring TNCs to obtain a certificate from DPU in order to do business in Massachusetts, (2) ensuring that TNCs and their drivers to carry appropriate liability insurance and (3) requiring TNCs to perform background checks on their drivers.

Since the amendments were promulgated, however, the new gubernatorial administration has adopted a different interpretation of DPU's authorizing legislation which does not permit DPU to implement the aforementioned duties without a further legislative act granting the agency the authority to do so.  Accordingly, the restrictions on TNCs which were to be implemented by DPU have not yet begun to be enforced.

C.    **Procedural History**

Plaintiffs filed their lawsuit and an emergency motion for a preliminary injunction on January 16, 2015, the same day that MassDOT's amendments to 540 CMR § 2.05 went into effect.  After briefing by both parties and a hearing, the Court denied the motion on February 5, 2015.  In a memorandum and order, the Court explained that its assessment of the balance of harms entailed by the proposed preliminary injunction was informed by its conclusion that issuing an injunction at that moment would short-circuit an ongoing political process at the city and state level through which potential legislation regulating TNCs was being considered.

The Court stated, however, that it expected that the City would demonstrate a purposeful commitment to action by promptly submitting recommendations on the regulation of TNCs to the City Council.  The City was warned that failure to do so would cause the Court to re-examine plaintiffs' request for injunctive relief.

On May 15, 2015, after plaintiffs had filed an amended complaint, defendants filed three motions to dismiss, one by the City of Boston, one by Commissioner Evans and one by the state defendants.  On August 26, 2015 plaintiffs filed a second motion for a preliminary injunction against the City.

**D.   Legislative and Regulatory Developments Since the Court's Consideration of Plaintiffs' First Motion for a Preliminary Injunction**

Since the Court's ruling on plaintiffs' first motion for a preliminary injunction, developments with respect to the potential regulation of TNCs have occurred at both the city and state level.  Specifically, the City of Boston's Taxi Advisory Committee has continued to convene and Commissioner Evans has purportedly been considering several changes to Rule 403, including a reduction in the required vehicle lease rates for taxi drivers, elimination of the requirement that medallion owners be radio association members and withdrawal of the requirement that taxicabs be factory new vehicles.

Further, several proposed bills that would regulate TNCs have been filed in the state legislature.  On March 7, 2016 the Massachusetts House of Representatives reported out of committee a revised version of House Bill H.4049, a bill proposed by Governor Baker on April 27, 2015.  The bill immediately moved to the House floor and was passed with amendments on March 9, 2016. The Massachusetts Senate is purportedly in the process of drafting its own bill with the intention that the chamber will approve a bill in time for both houses to agree on a final version before the end of the legislative session in July, 2016.

## II.  **Defendants' Motions to Dismiss**

The City of Boston, Commissioner Evans and the state defendants each moved to dismiss all of plaintiffs' claims against them for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  The state defendants also move for dismissal of plaintiffs' claims for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1).  Although the same claims apply to all parties, each party's motion will be discussed individually with discussion of the substantive claims preceding any necessary examination of plaintiffs' remedial claims.

### A.   **Legal Standards**

#### 1. **Motion to Dismiss for Failure to State a Claim**

To survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter" to state a claim for relief that is actionable as a matter of law and "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can draw the reasonable inference that the defendant is liable for the misconduct alleged. Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  A court may not disregard properly pled factual allegations even if actual proof of those facts is

improbable. Id.  Rather, the relevant inquiry focuses on the
reasonableness of the inference of liability that the plaintiff
is asking the court to draw. Id. at 13.

When rendering that determination, a court may not look
beyond the facts alleged in the complaint, documents
incorporated by reference therein and facts susceptible to
judicial notice. Haley v. City of Boston, 657 F.3d 39, 46 (1st
Cir. 2011).

### 2. Motion to Dismiss for Lack of Subject Matter Jurisdiction

In opposing a motion to dismiss for lack of subject matter
jurisdiction under Fed. R. Civ. P. 12(b)(1), the plaintiff bears
the burden of establishing that the Court has jurisdiction.
Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  The
Court assumes that all material allegations set forth in the
complaint are true. See Mulloy v. United States, 884 F.Supp.
622, 626 (D.Mass. 1995); Williams v. City of Boston, 784 F.2d
430, 433 (1st Cir. 1986).  The averments of the complaint, as
well as their proper inferences, are construed in favor of the
plaintiff and the claim will not be dismissed unless "it appears
beyond doubt that the plaintiff can provide no set of facts in
support of his claim which would entitle him to relief."
Williams, 784 F.2d at 433; Mulloy, 884 F.Supp. at 626.

**B.    City of Boston's Motion to Dismiss for Failure to State a Claim** (Docket No. 38)

Plaintiffs allege that defendants have violated their constitutional rights under the Takings and Equal Protection Clauses and their contract rights under Massachusetts law by declining to enforce Rule 403 against TNCs.  Defendants move to dismiss each of these substantive claims as well as plaintiffs' claim for declaratory relief.

### 1. Takings Clause (Count 4)

#### a.    Legal Standard

The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without just compensation. Maine Educ. Ass'n Benefits Trust v. Cioppa, 695 F.3d 145, 152 (1st Cir. 2012).  The clause applies to

> not only the paradigmatic physical taking ... but also to regulatory interferences, which transpire when some significant restriction is placed upon an owner's ... property [use] for which fairness and justice require that compensation be given.

Id. (citation and internal quotations omitted).

#### b.    Analysis

Plaintiffs' first substantive claim alleges that the City's failure to enforce Rule 403 against TNCs violates the Takings Clause because it constitutes a taking of property without the payment of just compensation.  Plaintiffs contend that they hold property rights in their medallions which they claim provide

them with the "exclusive right to engage in the taxi business."
By eliminating the exclusivity of the medallions as a means for
entering the transportation-for-hire market, plaintiffs aver,
the City took their property without paying just compensation.

A threshold question about which the parties disagree is
whether the medallions constitute property.  This is a difficult
and contentious issue given the large investment of resources
that plaintiffs have made to comply with the City's regulations
in order to obtain and maintain their medallions.  The Court
need not, however, decide this issue.  Even if the medallions
are property the rights associated therewith do not include the
right allegedly confiscated.

Plaintiffs frame the taking as the destruction of their
"exclusive right to engage in the taxi business" which they
obtained through the purchase of their medallions.   They
correctly note that the right to exclude others from one's
property is "perhaps one of the most fundamental of all property
interests." Lingle v. Chevron U.S.A., Inc., 528, 539 (2005).
Assuming, arguendo, that medallions are property, by purchasing
medallions plaintiffs each obtained an individual right to enter
the transportation-for-hire market.  Each medallion owner has
the right to exclude others from using his or her medallion and
the authority it confers to provide taxi services.

-12-

But the owner of a medallion does not possess a property interest in the transportation-for-hire market itself. Consequently, a medallion owner has no right to exclude others from the market.  This is evident in the fact that taxi medallion owners may not exclude other taxi medallion owners from participating in the market.  Nor would they be able exclude new medallion purchasers if the City were to increase summarily the number of available medallions.  Similarly, the aggregation of the rights of all medallion owners does not create a right that is new in kind, the right to exclude non-medallion owners from the market.  Rule 403 did not provide medallion owners with "an unalterable monopoly" over the transportation-for-hire market. Minneapolis Taxi Owners' Coal. v. City of Minneapolis, 572 F.3d 502, 508 (8th Cir. 2009).

The exclusivity of medallion owners' access to the market prior to the arrival of TNCs existed by virtue of the City's regulatory structure rather than the medallion owners' property rights.  Medallion owners have no property interest in the enforcement of Rule 403 against others. See Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 766 (2005).  If a person who wishes to operate a taxicab without a medallion is prevented from doing so, it is because he or she would violate municipal regulations, not because he or she would violate medallion owners' property rights.

Plaintiffs have not alleged that the City has revoked, suspended or impeded their ability to use their medallions. Plaintiffs' sole claim is that the loss of market exclusivity caused by the City's failure to enforce Rule 403 against TNCs has caused the value of their medallions to diminish.  Because plaintiffs have no right to market exclusivity, they have failed to state a claim upon which relief can be granted.  As such, defendant's motion to dismiss Claim 4 of the amended complaint will be allowed.

### 2. Equal Protection (Count 5)

#### a. Legal Standard

The Equal Protection Clause of the Fourteenth Amendment "requires that all persons similarly situated ... be treated alike." Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 10 (1st Cir. 2013) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  Unless a fundamental right or a suspect classification is at issue,

> courts will uphold legislation that provides for
> differential treatment upon a mere showing of a
> rational relationship between the disparate treatment
> and a legitimate government objective.

Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 145 (1st Cir. 2001) (citation omitted).

Rational basis review simply requires that there be "any reasonably conceivable set of facts" justifying the disparate

treatment. <u>FCC</u> v. <u>Beach Commc'ns, Inc.</u>, 508 U.S. 307, 313-14 (1993).  The government, however,

> may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.

<u>City of Cleburne</u>, 473 U.S. at 446.  Though differences may exist between two groups, "mere difference is not enough." <u>Frost</u> v. <u>Corp. Comm'n</u>, 278 U.S. 515, 522-23 (1929).  For a difference to justify two groups being treated differently, the difference must "hav[e] a fair and substantial relation to the object of the legislation." <u>Id.</u>

### b. Analysis

Plaintiffs' second substantive claim alleges that the City has violated the Equal Protection Clause by requiring taxi operators to meet the requirements of Rule 403 but declining to apply the rule to TNCs.  Once again the parties disagree with respect to a threshold question, whether traditional taxicab operators and TNCs are similarly situated.  Because several noticeable differences exist between taxis and TNCs, the issue is not easily disentangled and is subject to reassessment as the transportation industry evolves apace.  Taking all of the allegations in the complaint as true, however, plaintiffs have stated at least a plausible claim that the Equal Protection Clause requires that the two groups be treated alike.

First, the Court finds persuasive plaintiffs' argument that many of the obvious differences between taxis from TNCs, such as the kind of vehicle used and the fact that taxicabs must be clearly labeled, are caused by the City's application of the requirements of Rule 403 to taxi operators but not to TNCs. The City may not treat the two groups unequally and then argue that the results of that unequal treatment render the two groups dissimilarly situated and, consequently, not subject to equal protection analysis. Such circular logic is unavailing.

Other qualities cited by defendants fail to differentiate taxi operators from TNCs. Rides with taxis may now be requested and initiated through an app in an identical manner to rides with TNCs. For instance, one TNC app, Uber, allows consumers to use the same platform to initiate a ride with either a TNC vehicle or a traditional taxicab. Similarly, both TNCs and taxicab operators accept credit cards as a form of payment. The fact that taxicabs also may initiate rides through street hails and accept other forms of payment does not necessarily mean they are dissimilarly situated to TNCs for the purpose of equal protection analysis. In fact, taxis and TNCs are clearly similarly situated in one important respect. They are both "hackney carriages" as the term is defined by Rule 403. That is, they are both

> used or designed to be used for the conveyance of
> persons for hire from place to place within the city
> of Boston.

Boston Police Dep't R. 403 §1(I)(b) (August 29, 2008).

Plaintiffs have also raised a plausible claim that the City's disparate treatment of taxicab operators and TNCs is not rationally related to a legitimate government objective. The City offers two policy goals, both of which are legitimate government objectives, to justify its differential treatment of taxi operators and TNCs. Neither objective is, however, rationally related to any distinction between taxi operators and TNCs.

First, the City avers that declining to apply Rule 403 to TNCs enhances the City's interest in increasing the availability and accessibility of cost-effective transportation. It is likely true that permitting TNCs to operate unfettered by the requirements of Rule 403 furthers that goal. The City's distinction between taxi operators and TNCs in its application of the rule has, however, no "fair and substantial relation" to the furtherance of that objective. That is, the distinctions between taxicab operators and TNCs cited by the City, such as differences in the kind of vehicle and payment methods used, are unrelated to the City's policy objective. The differential treatment of the two kinds of commercial enterprises in

furtherance of that objective could, therefore, be considered arbitrary or irrational.

Second, the City asserts that it is rational for the City to decline to regulate TNCs for the time being because any action on the part of the City may be preempted by future state legislation.  While preemption by state law presents a potential problem, the prospect of any of the pending state bills becoming law is speculative at best.  Given that Rule 403's definition of "hackney carriages" includes both taxicabs and TNC vehicles, the City may be required to redraft its existing regulations even if new state legislation is enacted.  Thus the legitimacy of the City's goal of avoiding preemption is not self-evident and plaintiffs have stated a plausible claim for relief under the rational basis standard.  Accordingly, the City's motion to dismiss Count 5 of the complaint will be denied.

### 3. Breach of Contract (Count 6)

Plaintiffs' third substantive claim alleges that the City, by issuing taxi medallions to plaintiffs pursuant to state law and city regulations, entered into a binding contract with plaintiffs which it breached by destroying the market exclusivity that medallion owners formerly enjoyed.  Even when all of plaintiffs' factual allegations are accepted as true, however, plaintiffs have failed to state a claim upon which relief can be granted on this count.

Plaintiffs aver that the state laws and municipal regulations requiring taxicab operators to obtain a medallion constitute a binding, written agreement to provide market exclusivity to medallion holders.  There are multiple problems with their theory.  First, the cited statutory provisions are not bilateral agreements.  They are orders issued unilaterally by the government.  Consequently, at most they can be construed as offers rather than manifestations of mutual consent.

The statutory provisions cited by plaintiffs do not permit even this more modest interpretation, however, because they are written as prohibitions rather than as promises.  See, e.g., General Court of Massachusetts, Acts of 1930 ch. 392 § 3 ("no person shall drive or have charge of a hackney carriage, nor shall any person, firm or corporation set up and use a hackney carriage, unless licensed thereto by the Police Commissioner of the City of Boston.").  As such, they do not manifest

> an intention to act or refrain from acting in a
> specified way so as to justify a promisee in
> understanding that a commitment has been made.

See Rhode Island Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 849-50 (1995) (quoting Restatement (Second) of Contracts § 2 (1981)).  Nor does the text of the cited provisions mention, much less promise, exclusivity for medallion holders.

Second, the statutory provisions are not "sufficiently 'definite and certain in [their] terms' to be enforceable."

Dixon v. Wells Fargo Bank, N.A., F. Supp. 2d 336, 340 (D. Mass. 2011) (quoting Moore v. La-Z-Boy, Inc., 639 F. Supp. 2d 136, 142 (D. Mass. 2009).  As defendant points out, the provisions at issue are mutable.  Statutes are regularly amended, and Rule 403 includes a provision that explicitly provides for the amendment of the rule for various reasons, including "the changing needs of the industry." Boston Police Dep't R. 403 §1(II)(d) (August 29, 2008).  Because the "contract" permits the City unilaterally to modify the terms of the agreement without the assent of taxi medallion owners, any implied promise that the regulatory scheme would not change is illusory. See Tinkham v. Jenny Craig, Inc., 699 N.E.2d 1255, 1257 (Mass. App. Ct. 1998) (holding that an employee's at-will employment status, which allowed the employee to be fired at any time, made any promise of promotion illusory).

     Finally, a contract binding on the City could not have been formed because the alleged agreement does not comply with the necessary statutory requirements of M.G.L. ch. 43, § 29.  See Park Drive Towing, Inc. v. City of Revere, 442 Mass. 80, 83 (2004) ("It is a well-established principle that a party dealing with a city or town cannot recover if statutory requirements [such as those contained in G.L. c. 43, § 29] have not been observed.").  Although the statutory provisions are in writing, as discussed above, those provisions constitute at most an

offer, not an agreement.  Consequently, the requirement of

M.G.L. ch. 43, § 29 that "[a]ll contracts made by any

department, board or commission ... shall be in writing" is not

fulfilled.  Further, plaintiffs do not dispute that

> the approval of the mayor ... and also of the officer
> of the head of the deparment ... making the contract

was not "affixed" to the agreement as required. M.G.L. ch. 43, §

29.  Accordingly, plaintiffs have failed to allege a viable

claim for breach of contract and Count 6 of the complaint will

be dismissed with respect to the City.

### 4. Promissory Estoppel (Count 7) and Equitable Estoppel (Count 8)

#### a.  Legal Standard

To state a claim for estoppel under Massachusetts law, a

party must show

> (1.) A representation or conduct amounting to a
> representation intended to induce a course of conduct
> on the part of the person to whom the representation
> is made. (2.) An act or omission resulting from the
> representation, whether actual or by conduct, by the
> person to whom the representation is made. (3.)
> Detriment to such person as a consequence of the act
> or omission.

Turnpike Motors, Inc. v. Newbury Group, Inc., 596 N.E.2d 989,

991 (1992).

#### b.  Analysis

Plaintiffs' final substantive claims allege the City should

be required to enforce Rule 403 against TNCs because plaintiffs

have detrimentally relied on the City's pre-existing regulatory structure.  Under their promissory estoppel theory, plaintiffs claim that the comprehensive regulatory program created by Rule 403 constituted a promise of market exclusivity upon which plaintiffs relied.  Under their equitable estoppel theory, plaintiffs allege that the City's enactment and consistent enforcement of Rule 403 against taxi operators constitute affirmative acts which should require the City to enforce the rule against TNCs.

Neither theory states a claim upon which relief can be granted.  While plaintiffs have clearly shown detriment, they have failed to allege that they reasonably relied on a representation by the City that they would enjoy permanent market exclusivity.  As discussed above, Rule 403 explicitly provides that the City's regulatory structure may be amended due to reasons including "the changing needs of the industry."  If, as plaintiffs contend, TNCs and taxicab operators work within the same industry, plaintiffs should have reasonably anticipated that changes in the industry such as the advent of TNCs could lead to an alteration of the City's regulatory structure.  Under such circumstances, reliance on the existing regulations with the expectation that they would not change was unreasonable. Accordingly, defendant's motion to dismiss will be allowed with respect to Counts 7 and 8.

### 5. Declaratory Judgment (Count 1)

The City contends that the Court should dismiss plaintiffs'
request for declaratory relief on two grounds.  Neither provides
a reason for dismissal.  First, defendant argues that 28 U.S.C.
§ 2210(a) creates a remedy, and not a cause of action.  Even if
that assertion is true, however, it is not grounds for dismissal
of the count nor for precluding plaintiffs from declaratory
relief.  A well-pled complaint must include a demand for the
kinds of relief sought, and plaintiffs' complaint conforms to
that requirement. See Fed. R. Civ. P. 8(a)(3).

Second, the City avers that the Court should

exercise its discretion not to issue a declaratory
judgment in the present posture of this case.

Given that no request for interim relief in the form of a
declaratory judgment is before the Court, that statement is
undeniable.  The fact that the Court retains discretion to enter
a declaratory judgment if plaintiffs ultimately prevail is not,
however, a reason to deny plaintiffs such a remedy before the
merits of the case have been decided.  This argument is
therefore premature.  Accordingly, defendant's motion to dismiss
Count 1 of the amended complaint will be denied.

### C. Commissioner Evans's Motion to Dismiss for Failure to State a Claim (Docket No. 40)

Plaintiffs allege claims against Commissioner Evans
identical to those alleged against the City of Boston.  While

the complaint does not specify whether defendant is being sued in his individual or official capacity, he appears to have assumed, and plaintiffs do not disagree, that the claims are directed toward Commissioner Evans in both capacities. Accordingly, the Court will address both in ruling on the motion to dismiss.

### 1. Takings Clause (Count 4)

Plaintiffs' Takings Clause claim against Commissioner Evans is essentially the same as their claim against the City.  As police commissioner, defendant is vested with the exclusive authority to regulate "hackney carriages" within the City. Acting in that capacity, defendant has declined to enforce Rule 403 against TNCs operating within the City.  Plaintiffs allege that such a decision constitutes a taking of their property interest in their medallions because it has destroyed their exclusive right to operate in the transportation-for-hire market.

As discussed above in the context of the City's motion to dismiss, whatever property rights plaintiffs may possess in their medallions, those rights do not encompass a right to exclude others from the transportation-for-hire marketplace. For that reason, plaintiffs have failed to allege a taking of their property.  Consequently, the motion to dismiss will be

allowed with respect to plaintiffs' takings claim against Commissioner Evans in both his official and personal capacities.

### 2. Equal Protection Clause (Count 5)

#### a.  Official Capacity

Plaintiffs' claim against Commissioner Evans under the Equal Protection Clause is identical to their claim against the City.  By choosing to enforce Rule 403 against taxicab operators but not against TNCs, plaintiffs allege, Commissioner Evans treated two similarly situated groups differently.  Plaintiffs have alleged plausible factual allegations supporting their claim that the classification was not rationally related to the policy goals that the City and Commissioner Evans contend the disparate treatment was intended to further.  Therefore defendant's motion to dismiss will be denied with respect to plaintiffs' equal protection claim against him in his official capacity.

#### b.  Personal Capacity

With respect to plaintiffs' same claim against Commissioner Evans in his personal capacity, in addition to his substantive arguments defendant also asserts the protection of qualified immunity.  Qualified immunity protects government officials performing discretionary functions from liability for conduct that is objectively reasonable. Harlow v. Fitzgerald, 457 U.S.

800, 818 (1982). It shields officials only from claims brought against them in their individual capacities.

To assess qualified immunity claims, the Court applies a two-step inquiry. In the first step, the Court must decide "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). In the second step, the Court must determine whether the right was "clearly established at the time of the defendant's alleged violation." Id.

The second stage of the inquiry has two facets, one focusing on law and the other on fact. The first facet requires the Court to examine the level of clarity of the law at the time of the alleged civil rights deprivation. Id. For a right to be clearly established,

> the contours of the right must be sufficiently clear
> that a reasonable official would understand that what
> he is doing violates that right. This is not to say
> that an official action is protected by qualified
> immunity unless the very action in question has
> previously been held unlawful, but it is to say that
> in the light of pre-existing law the unlawfulness must
> be apparent.

Wilson v. Layne, 526 U.S. 603, 615 (1999) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987). The second facet involves an analysis of whether, given the factual circumstances of the case, "a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights."

Maldonado, 568 F.3d at 269.  The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).

As explained above in the discussion of the merits of plaintiffs' equal protection claim, plaintiffs have alleged the violation of a constitutional right.  That right, the right not to be subjected to the unequal application of Rule 403 on the basis of a classification that bears no rational relationship to the City's goal of expanding the availability and accessibility of cost-effective transportation, was and continues to be sufficiently clear to put a reasonable official on notice.  See, e.g., City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 448 (1985).

The factual aspect of the second prong is, however, less easily disposed of.  When TNCs began to enter the transportation-for-hire market, it may not have been discernible that they were situated similarly to taxicab operators.  Over time, however, differences between taxis and TNCs have receded. Taxicabs may now be requested in the same manner as TNCs, and TNCs have become fixtures in the transportation-for-hire marketplace, commonly used for the same purposes as taxis. Taking the situation as it has evolved and based on the allegations in the complaint, a reasonable official would

understand that refusing to apply Rule 403 to TNCs while continuing to enforce it against taxicab operators violates the Equal Protection Clause. <u>Maldonado</u>, 568 F.3d at 269. Consequently, the Court cannot determine, at this stage of the litigation, whether Commissioner Evans is entitled to qualified immunity.  Defendant's motion to dismiss Count 5 against him in his personal capacity will be denied.

### 3. Breach of Contract (Count 6), Promissory Estoppel (Count 7) and Equitable Estoppel (Count 8)

In their opposition, plaintiffs concede that that they have not stated claims against Commissioner Evans for breach of contract, promissory estoppel and equitable estoppel.  They submit that they intend to pursue such claims only against the City of Boston.  Accordingly, Counts 6, 7 and 8 of the complaint will be dismissed with respect to Commissioner Evans in both his official and individual capacities.

### D.   The State Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to State a Claim (Docket No. 42)

Plaintiffs allege claims against Angela M. O'Connor, the DPU Chairman and Jolette A. Westbrook and Robert Hayden, DPU Commissioners, as well as against MassDOT Secretary Stephanie Pollack.  All four defendants move to dismiss the claims against them for lack of jurisdiction and for failure to state a claim. Fed. R. Civ. P. 12(b)(1)&(6).  Because plaintiffs' claims differ

with respect to the two agencies and the regulations they
implement, the claims against the two sets of defendants will be
addressed separately.

### 1. Claims Against the DPU Defendants

The three DPU defendants challenge plaintiffs' claims
against them on the ground that they are not ripe for
adjudication.  The purpose of the ripeness doctrine is

> to prevent the courts, through avoidance of premature
> adjudication, from entangling themselves in abstract
> disagreements.

Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) abrogated
on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).  To
demonstrate that a claim is ripe for litigation, a plaintiff
must show two elements, 1) "the fitness of the issues for
judicial decision" and 2) "the hardship to the parties of
withholding court consideration." Roman Catholic Bishop of
Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir.
2013) (quoting Abbott Labs., 387 U.S. at 149).  The first
element, fitness, examines

> whether the claim involves uncertain and contingent
> events that may not occur as anticipated or may not
> occur at all.

Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535
(1st Cir. 1995).

Defendants aver that DPU lacks statutory authority to
regulate TNCs and plaintiffs do not provide any basis for

challenging that assertion.  Massachusetts law provides DPU with
authority to license operators of motor vehicles that carry
passengers in

> a manner as to afford a means of transportation
> similar to that afforded by a railway company ... or
> for transporting passengers for hire as a business
> between fixed and regular termini.

M.G.L. ch. 159A § 1.  Charter vehicles, school vehicles and
special service vehicles all must obtain licenses from DPU.  Id.
§11A.  TNCs vehicles do not, however, meet the requirements for
any of those categories of vehicles.

MassDOT regulations issued under the prior gubernatorial
administration state that

> DPU shall have general supervision and regulation of,
> and jurisdiction and control over Transportation
> Network Companies as common carriers.

540 C.M.R. § 2.05(4¾)(b).  The regulations also state that TNCs
must hold a valid Transportation Network Company Certificate
issued by DPU or a notice stating that DPU is not yet issuing
such certificates. Id. § 205.3.  The regulations of one agency
cannot, however, grant another agency regulatory power where no
statute has done so. See, e.g., City of Arlington v. Fed. Comm.
Commc'n Comm'n, 133 S. Ct. 1863, 1868 (2013) (holding that an
agency must "stay[] within the bounds of its statutory
authority.").

Plaintiffs assert that DPU's issuance of notices clarifying that the agency is not yet providing TNC certificates constitutes an affirmative act by DPU in connection with the enforcement of MassDOT's regulations.  They maintain that DPU "should be forced to apply the same law to taxicabs and TNCs," presumably by requiring TNCs to meet requirements similar to those which taxis are required to meet under MassDOT's regulations.  But because DPU does not currently have the statutory authority to regulate either TNCs or taxis, it would be impossible for the Court to award plaintiffs their requested relief.

Although a bill is currently pending in the Massachusetts legislature which would grant DPU the authority to regulate TNCs, the enactment of the bill remains an "uncertain and contingent event" which renders plaintiffs' claim unfit for judicial review. Ernst & Young, 45 F.3d at 535.  Accordingly, plaintiffs' claims against the DPU defendants in both their official and personal capacities will be dismissed for lack of ripeness.

### 2. Claims Against the MassDOT Defendant

#### a. Takings Clause (Count 4)

Plaintiffs' claim under the Takings Clause against Secretary Pollock advances a similar theory to their claims against the City and Commissioner Evans.  Plaintiffs allege that

-31-

the amendments to the MassDOT regulations have destroyed their exclusive right to operate within the transportation-for-hire market by permitting TNCs to operate without being required to purchase taxi medallions.  As explained above in the context of plaintiffs' takings claims against the City and Commissioner Evans, however, plaintiffs' property rights in their medallions, if such rights exist, does not include a right to market exclusivity.

Furthermore, plaintiffs have failed to explain how the MassDOT's failure to require TNCs to purchase taxi medallions from the City constitutes a taking.  Unlike the City's regulations, the MassDOT regulations do not require taxi operators or TNCs to purchase City medallions.  The amendments to the regulations do not alter that fact, and thus it is unclear what aspect of the amendments plaintiffs allege constitutes a taking.  Accordingly, the motion to dismiss will be allowed with respect to Count 4 of plaintiffs' amended complaint against Secretary Pollock.

### b. Equal Protection Clause (Count 5)

Plaintiffs' claim against Secretary Pollock under the Equal Protection Clause alleges that the new amendments to 540 C.M.R. § 2.05 issued by MassDOT governing TNCs, which took effect in January, 2015, create an "unequal application of two sets of laws to persons engaging in substantially the same business

activity" without a rational basis for doing so.  Defendant argues that plaintiffs' equal protection claim should be dismissed both for lack of standing and for failure to state a claim on the merits.

To allege standing to bring a particular claim, a plaintiff must show that

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).

Secretary Pollock first responds that plaintiffs have not alleged an injury-in-fact.  In their amended complaint, plaintiffs allege that the enforcement of MassDOT's new amendments to 540 C.M.R. § 2.05 would cause an injury in the form of damage to the "market and collateral value of the [taxi] medallions and their marketability."  Defendant argues that this does not constitute an injury because plaintiffs state in their amended complaint that the injury would be "the same" whether MassDOT continued its prior enforcement patterns or began enforcing the new amendments.  Defendant asserts that, in order to show an injury, plaintiffs must allege that enforcement of the regulations would lead to increased harm.

-33-

Secretary Pollock further submits that plaintiffs have failed to allege

> a causal connection between the challenged action and the identified harm . . . [or that a] favorable resolution of [the] claim would likely redress the professed injury.

Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012). Plaintiffs request as relief an order requiring that the unamended version of the regulation be enforced, in which case MassDOT would be required to regulate TNCs as livery vehicles. Secretary Pollock responds that this would merely constitute a return to the state of affairs before the implementation of the new amendments and, as such, plaintiffs would once again experience "the same" harm.

Plaintiffs allege, however, that MassDOT did not require TNCs to register as livery vehicles before the amendments were enacted.  Instead, prior to the implementation of the new amendments TNC vehicles were purportedly allowed to register as private passenger motor vehicles which were not and are not subjected to the extensive and burdensome requirements to which taxicabs and livery vehicles are subjected.  The new amendments essentially codify this lack of enforcement by officially permitting TNC vehicles to register as private passenger motor vehicles.  Accordingly, if the unamended version of the regulations were enforced, plaintiffs would no longer experience

"the same" harm which they experienced before the implementation of the amendments and which they continue to experience after the implementation.

Although plaintiffs have stated a more logically cohesive theory than defendant alleges gives them credit for, their allegations still fail to show that their injury is caused by Secretary Pollock's alleged conduct.  Plaintiffs' primary argument with respect to their alleged loss of medallion value is that taxicab operators are burdened by expensive regulations that

> the City imposes ... on taxis [but] that the State
> Defendants do not require TNCs to comply with.

Nor does the state require TNCs to comply with City livery regulations.  Nevertheless, plaintiffs fail to acknowledge that the State does not require taxicab operators to comply with City taxi or livery regulations either.  The MassDOT regulations define a "taxicab" as "any vehicle ... which is licensed by a municipality pursuant to M.G.L. ch. 40, § 22 as a taxicab."  The regulations do not, however, require any particular vehicle to be licensed by a municipality as a taxicab.  Therefore any burden created by the City's regulations is attributable solely to the City and Commissioner Evans, not to the state defendants.

Plaintiffs also allege more generally that the amended MassDOT regulation places a "heavier burden" on taxicabs than on

-35-

TNC vehicles and that such a disparate burden has caused their economic injury.  Plaintiffs have failed, however, to allege sufficient facts to support that claim.  Based on the facts set forth in this Court and a review of 540 C.M.R. ch. 2.00, the only requirements imposed upon taxicabs by the MassDOT regulations are a requirement that they bear a particular kind of license plate and pay a registration fee corresponding to that kind of license plate.  The same requirements apply to TNC vehicles.  Plaintiffs complain that the regulations do not require TNC drivers to carry commercial vehicle insurance but they also do not require taxi drivers to carry commercial vehicle insurance.

In fact, 540 C.M.R. § 2.05 actually creates additional requirements for TNC drivers, such as an age limit, proof of personal motor vehicle insurance and limitations with respect to traffic violations, to which taxi drivers are not subjected. Although taxicabs and TNC vehicles are required to bear different license plates, they are currently required to pay the same amount in vehicle registration fees.  Plaintiffs fail to state any reason why such differences in treatment would impose a greater burden on taxicab operators.  They have, therefore, failed to allege a causal connection between the alleged unequal treatment and their economic injury.  Accordingly, Secretary

Pollock's motion to dismiss will be allowed with respect to Count 5 of the complaint.

### c. Breach of Contract (Count 6), Promissory Estoppel (Count 7) and Equitable Estoppel (Count 8)

Defendant does not address plaintiffs' claims for breach of contract, promissory estoppel and equitable estoppel in her motion to dismiss but rather presumes that those claims do not apply to her.  Plaintiffs, on the other hand, summarily assert in their opposition to the motion to dismiss that the state defendants are liable on all three counts

> for allowing TNCs to operate private passenger vehicles in the City of Boston without taxi medallions, thereby depriving Plaintiffs of their property interest in their taxi medallions.

Plaintiffs do not explain, however, how Secretary Pollack or MassDOT could be liable for allowing TNCs to operate without medallions when MassDOT has no control over the issuance of taxi medallions or the enforcement of municipal regulations connected therewith.  Further, the terms of the three claims in the amended complaint refer only to the City and its actions and fail even to mention Secretary Pollack or MassDOT.  Accordingly, the Court will dismiss Counts 6, 7 and 8 with respect to Secretary Pollack for failure to state a claim upon which relief can be granted.

> d. **Declaratory Judgment (Count 1), Injunctive Relief (Count 2) and Monetary Relief (Count 3)**

Defendant argues for the dismissal of plaintiffs' remedial claims only with respect to the application of the request for monetary relief against Secretary Pollock in her official capacity.  Because all of plaintiffs' substantive claims will be dismissed, however, their complaint no longer provides a ground upon which relief can be granted.  Counts 1, 2 and 3 of the amended complaint will therefore also be dismissed as against Secretary Pollock.

## III. <u>Plaintiffs' Second Motion for a Preliminary Injunction</u>

Plaintiffs, for their part, renew their motion seeking a preliminary injunction against the City.  They seek an order directing the City 1) to enforce Rule 403 against all vehicles operating for hire in the City, including TNC vehicles and 2) to order TNCs not in compliance with the applicable city codes and insurance laws, i.e. vehicles operating with private plates and using personal insurance policies to operate for hire, to cease operation within the City until they have complied with the requirements of Rule 403.

Because plaintiffs' Takings Clause, breach of contract, promissory estoppel and equitable estoppel claims against the City will be dismissed, the Court is without authority to grant plaintiffs a preliminary injunction based upon those claims.

Consequently, the Court will limit its consideration of plaintiffs' request for injunctive relief to an analysis of plaintiffs' remaining equal protection claim.

### A. Legal Standard

In order to obtain a preliminary injunction, the moving party must establish 1) a reasonable likelihood of success on the merits, 2) the potential for irreparable harm if the injunction is withheld, 3) a favorable balance of hardships and 4) a favorable effect on the public interest. Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007).  Courts balance these factors on a "sliding scale," sometimes awarding relief based on a lower likelihood of success on the merits when the potential for irreparable harm is high.  11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.3, p. 195 (2d ed. 1995).

The Court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114, n.2 (D. Mass. 2010) (quoting Elrod v. Burns, 427 U.S. 347, 350, n.1 (1976).  The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction. See Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986).

**B. Analysis**

Nearly 14 months have elapsed since this Court's ruling on plaintiffs' first motion for a preliminary injunction.  During that time, the Court has benefitted from numerous additional briefings from the parties on the claims at issue in this case, plaintiffs' amendments to their complaint and further time to observe the development of the City and State political processes.  During this period it has become apparent that plaintiffs face a growing potential for irreparable harm if neither the City nor the State addresses the issues they raise.

As TNCs become more prevalent and their existing operational structure becomes an engrained segment of the transportation-for-hire market, amending the existing regulatory structure to address TNCs becomes mandatory.  Further, as the value of plaintiffs' medallions wanes, the medallion financing market has begun to collapse, threatening irreparable harm to the ability of the holders of individual medallions to continue operating in the industry.

In the interim, the Taxi Advisory Committee has failed to take any meaningful action toward changing Boston's regulations to address TNCs.  The General Court has begun to move through the bicameral approval process one or two of the numerous bills filed but no legislation has yet been enacted.  Yet it is imperative that the state political process be allowed to

proceed unfettered so that a legislative solution to the concerns raised by plaintiffs can be devised.

As defendants note, federal courts considering equitable remedies must exercise discretion to "avoid ... needless friction with state policies." R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 500-01 (1941). Comity considerations urge federal courts to adopt a "proper reluctance" to interfere with the operations of state governments "where the Federal rights of the persons could otherwise be preserved unimpaired." Levin v. Commerce Energy, Inc., 560 U.S. 413, 422 (2010). Where such interests do not remain unimpaired, however, the Court may be compelled to provide appropriate relief to protect such Federal rights.

As detailed in the Court's discussion of plaintiffs' equal protection claim, plaintiffs have made a reasonable showing of their ability to succeed on that claim. Should the balance of hardships continue to shift toward favoring interim relief, the Court will respond accordingly.

Therefore, taking judicial notice of recent activity in the Massachusetts General Court with respect to the regulation of TNCs and in expectation of some resolution during the current legislative session, the Court will direct the defendant City of Boston, on or before September 30, 2016, 1) to inform the Court what changes to Rule 403 it intends to adopt regardless of the

-41-

status of the state law at that time and 2) to show cause why this Court should not enter a preliminary injunction ordering the City to apply Rule 403 to TNCs.

**ORDER**

For the forgoing reasons,

1) as to defendant City of Boston,

    a. the motion to dismiss (Docket No. 38) is, with respect to Counts 1, 2, 3 and 5 of the amended complaint, **DENIED** and

    b. the motion to dismiss (Docket No. 38) is, with respect to Counts 4, 6, 7 and 8 of the amended complaint, **ALLOWED**;

2) as to defendant William Evans,

    a. the motion to dismiss (Docket No. 40) is, with respect to Counts 1, 2, 3 and 5 of the amended complaint, **DENIED,**

    b. the motion to dismiss (Docket No. 40) is, with respect to Count 4 of the amended complaint, **ALLOWED** and

    c. Counts 6, 7 and 8 of the amended complaint are **DISMISSED;**

3) as to defendants Angela M. O'Connor, Jolette A. Westbrook and Robert Hayden, the motion to dismiss (Docket No. 42) is **ALLOWED;**

4) as to defendant Stephanie Pollock, the motion to dismiss (Docket No. 42) is **ALLOWED**;

5) plaintiffs' second motion for a preliminary injunction (Docket No. 56) is **DENIED** without prejudice.  On or before September 30, 2016, defendant City of Boston is directed 1) to inform the Court what changes to Rule 403 it intends to adopt regardless of the status of the state law at that time and 2) to show cause why this Court should not enter a preliminary injunction ordering the City to apply Rule 403 to TNCs.


**So ordered.**

/s/ Nathaniel M. Gorton _ __
Nathaniel M. Gorton
United States District Judge

Dated March 31, 2016